# Staunton

## M. E. BURSON V. CITY OF BRISTOL.

September 5, 1940.

Record No. 2175.

Present, All the Justices.

The opinion states the case.

*John T. DeHart,* for the plaintiff in error.

*Donald T. Stant* and *Bradley Roberts,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

M. E. Burson instituted this action against the city of Bristol, Virginia, to recover damages caused by acts of officers and servants of the city in pulling down the brick walls of a burned building, in such a manner that they fell upon and destroyed an adjoining building owned by him.

The original declaration of the plaintiff contained five counts. The trial court sustained a demurrer to this declaration and all of its counts, upon the ground that the allegation showed that the city acted in a governmental capacity, but gave the plaintiff the right to amend. The plaintiff excepted to the ruling of the court and thereupon amended

his declaration by adding an additional count. The additional count alleged that the damages of the plaintiff were occasioned by negligent acts of officers and servants of the city, committed in the performance of the ministerial duty of the city to keep its streets in a safe condition for public use.

The city again demurred. The court again sustained the demurrer to the first five counts and overruled it as to the sixth and additional count. It then directed that the case go to trial on the sixth count, that count to be treated as the plaintiff's amended declaration. To this ruling the defendant excepted, but the plaintiff did not.

At the conclusion of the plaintiff's evidence and again at the conclusion of all the evidence, the court overruled a motion to strike the evidence. The jury awarded the plaintiff the sum of $3,750. The trial judge set aside the jury's verdict and entered final judgment for the defendant.

We are called upon to determine whether the acts, shown by the evidence to have been committed, were *ultra vires* on the part of the city, or its officers, or, if authorized, were committed in the exercise of the governmental rather than the ministerial capacity of the city.

The evidence, which is certified to us in narrative form, discloses the following facts supporting the claim of the plaintiff:

Burson is the owner of a lot or parcel of land in Bristol, fronting 25¼ feet on the western side of Moore street and running back therefrom between parallel lines a distance of 70 feet. The lot is bounded on the north by Winston street and on the south by the land of the Bank of Marion.

Burson, in 1927, erected a one-story brick building covering the whole of the lot and costing $4,900. The building was of heavy construction, of the best material and in good condition. It was leased and occupied, at the time of the fire hereinafter mentioned, at a rental of $50 per month.

On the adjoining lot belonging to the Bank of Marion there was a four-story brick building, equipped with a five-story elevator shaft. This building was 65 feet deep measur-

ing from Moore street, the elevator shaft being in its north-western corner adjacent to Burson's property. The west and north walls of this building formed the west and north walls of the elevator shaft; the south and east walls of the shaft were built in. The elevator shaft was rectangular, being about 10 feet wide, measuring north to south, and 15 feet long. The entire north wall of the bank's building, including that portion forming the elevator shaft, paralleled the south wall of the Burson building to Moore street. A space of about two inches separated the two walls except for a short distance where there was a slight offset in the walls of the bank's building.

On the early morning of Thursday, December 16, 1937, a fire broke out in the Bank of Marion building which totally destroyed it, leaving only some of the walls and the elevator shaft standing. On that day, after the fire had been extinguished, a part of the walls were pulled down by the fire company, leaving standing only the walls of the elevator shaft and a segment of the north wall attached thereto and adjacent to the Burson building. The debris occasioned by the fire was cleared off the adjoining streets and they were opened for traffic.

O. L. Cross, the chief of the fire department of the city of Bristol, stated that he had determined on the morning of the fire that all of the walls should come down because they were dangerous and likely to fall at any time. He made further inspections, on Saturday morning, two days after the fire, and on Monday, four days after the fire, which confirmed his opinion that the walls created a very dangerous condition and would have to be pulled down.

His inspection showed that the heat of the fire had cracked and warped the walls and that particles of mortar and brick were falling down. He concluded that the north wall and shaft could not withstand the elements and the wind and that they were so high that they constituted an imminent hazard to persons in the immediate vicinity. He reported the situation and his conclusion to his superior, the city manager.

Mr. P. A. Goodwyn, the city manager, was present during the time of the fire and later in the same morning when part of the walls were pulled down. He testified that the weakened condition of the walls left standing created a "very dangerous condition;" that it had been reported to him that customers would not go to the store building of Burson because of that condition; that it could not have been foretold in which direction the walls would have fallen if left to fall from their own decay and weight; that he approved the report and recommendation of Cross to pull the walls down; that he left to Cross the entire responsibility of securing the labor and of determining the method to be used; that he saw the work of demolition being carried out and approved both the method and the means employed; that on December 21st, he notified the Bank of Marion that the walls of its building would have to be torn down and that it was important to act quickly; and that he told the bank officers the fire department was better equipped to do the work and that a bill would be rendered to it for the actual costs. No notice of the projected razing operations was given to Burson.

The Bristol fire department is a volunteer department, and it appears that the members thereof receive pay only for the time engaged in the performance of their duties.

Several members of the fire department testified, in substantiation of their chief, that the north wall and the elevator shaft were cracked, crumbling and dangerous, and that they were located so close to the street that they constituted a menace and hazard to the safety of any person using either Moore or Winston streets.

On December 21st, five days after the fire, Cross began to make arrangements to raze the walls. Accompanied by the city manager, he assembled his crew of workmen and equipment and began operations. The crew was composed of members of the fire department and the operators of two trucks which he had borrowed from two local public service companies. First, the crew roped off and blocked Moore and Winston streets to public traffic. They then

ran a cable through a window opening in the third story of the elevator shaft, brought its end out of another opening and tied it to the main line of the cable. The other end of the cable was attached to a windlass on one of the trucks stationed some 70 feet to the south in Moore street. Being unable to keep this truck in place and thereby maintain a steady pull, they brought the second truck up and blocked and tied it to the first truck. The first motor truck furnished the power to operate the windlass. After a series of pulls and jerks, the cable cut through the brick wall. The wall tottered out of plumb, crumpled or buckled, and kicked out backwards, thereby causing the wall to fall across the rear and center of the Burson building and into Winston street. The Burson building was almost completely demolished.

At the top of the elevator shaft there was elevator machinery weighing about 5,500 pounds. The debris which fell on the Burson building and into Winston street was composed of pieces of steel and torn metal from the elevator machinery, in addition to masses of bricks.

The walls of the elevator shaft were about 45 feet high and 25¼ feet from Winston street, the attached segment of the north wall of the building extending toward Moore street.

No provision was taken for the safety of the Burson building, save that a few planks were laid on its roof.

A few minutes prior to the actual razing of the walls, the city manager and the fire chief were warned by a graduate engineer and architect of thirty years experience that if they carried out their operations in the manner proposed the outer or north wall would very likely kick out or fall over on the Burson building.

Four witnesses, men engaged for years in construction work and experienced in tearing down buildings and structures, described several other well known methods for tearing down brick walls damaged by fire as being safer than the one here used, and said the officers of the city employed not only the least prudent but, in fact, the crudest method

and means, without taking the most necessary and simplest precautions to insure safety to adjoining property.

On December 24, 1937, the city manager billed the Bank of Marion in the sum of $91, the cost of razing its brick walls. This $91 was distributed, through the city treasury, to the volunteer members of the fire department for their labor during the razing operations.

The city manager of Bristol is, by its charter, made the administrative and executive head of the municipal government. He is charged with the responsibility of seeing that all laws and ordinances are enforced, with the duty of appointing and removing city officers and employees, except employees in the financial, legal and judicial departments, and attendants of the council, and with the duty of exercising supervision and control over all departments and divisions of the city, together with general supervision of all public improvements and undertakings.

Under other sections of the charter, the city is given authority to do all things necessary or expedient in promoting and maintaining the general welfare, comfort and health of its inhabitants, specifically "to remove or require to be removed or reconstructed any building, structure or addition thereto which by reason of dilapidation, defect of structure, or other causes, may have become dangerous to life or property, or which may be erected contrary to law," and "to compel the abatement and removal of all nuisances * * * at the expense of the person or persons causing the same, or of the owner or occupant of the ground or premises whereon the same may be."

One of the prime objects of the city manager form of government is to place authority and to fix responsibility for the performance of the duties of the city. It is the conceded duty of the city to keep its streets and sidewalks safe for those who travel in the usual modes. The performance of this duty necessarily falls upon the officers and agents of the city. In the instant case, the charter of the city of Bristol specifically charged its city manager, as its executive and administrative head, with the duty of

exercising supervision and control over all public improvements. Consequently, it charged him with responsibility for the care and protection of the city streets. In the discharge of that duty, he was also clothed with the power of selection and with complete control of persons employed therefor.

Acts committed in compliance with a duty laid upon a city by law and by an officer specifically charged with the performance of that duty are not *ultra vires* as to the city or such officer.

The cases of *Radford* v. *Clark,* 113 Va. 199, 73 S. E. 571, 38 L. R. A., N. S. 281, and *Robinson* v. *Danville,* 101 Va. 213, 43 S. E. 337, relating to *ultra vires* acts are not in point here. In the first case, it was held that the operation of a rock quarry by a city without statutory authority was *ultra vires,* and that the taking of rock by the city from such a quarry for use upon its streets was not incidental to its duty of keeping its streets in a reasonably safe condition. In the second case, it was held that a municipal corporation was not liable for injuries to private property caused by the overflow of water from an obstructed private culvert which the city was not bound to keep open and in repair and over which it exercised no control.

In this State, we have long determined the liability or non-liability of a city for acts committed by it according to whether the act was done in its governmental or proprietary character. If the act be done in carrying out a governmental function, the city is not liable; if it be done in the exercise of some power of a private, proprietary or ministerial nature, the city is liable.

In the recent case of *Hoggard* v. *City of Richmond,* 172 Va. 145, 200 S. E. 610, 120 A. L. R. 1368, Mr. Justice Hudgins, in a well considered opinion, reviewed the general law as to the liability of municipalities, and differentiated between the governmental and ministerial capacities of a city, giving reasons for the distinction. He cited numerous cases involving the application of the rule to the various activities of a municipality. The distinction is so fully

considered and clearly established in our own cases, after a full examination of the authorities elsewhere, that we need not concern ourselves very much about cases from other states, nor pursue the subject further than is necessary to the ends of this case. The difficulty in any case lies in the application of the principles of the rule to particular facts.

In the instant case, the application of the general principle is not difficult. This court has consistently held that the duty of a city to keep and maintain its streets in repair and in a safe condition for travel, free from defects and obstructions, is a ministerial duty. *City of Norfolk* v. *Hall,* 175 Va. 545, 9 S. E. (2d) 356, decided June 10th, 1940, and cases cited.

But it is said here that the hazardous situation arose not from any condition in the streets themselves, but from a danger outside the streets. We do not think the rule is so limited as to exclude all danger arising beyond the limits of a street. The purpose of the rule is to provide safety to persons lawfully using the streets. The rule, indeed, would be but half discharged were it not held to make the municipality liable for dangers known to exist outside the street's limit, but so near thereto as to endanger public travel thereon. It is as much the duty of a city to take steps to ward off and to prevent the known probability of injury to users of its streets as it is its duty to remove dangerous defects and obstructions within the streets themselves. *Clark* v. *Richmond,* 83 Va. 355, 5 S. E. 369, 5 Am. St. Rep. 281; *Parker* v. *Macon,* 39 Ga. 725, 99 Am. Dec. 486; McQuillan Municipal Corporations (2d Ed.) section 2963.

Injuries caused by defective instrumentalities immediately adjacent to a street may be as grievous as those which result from defects within the street itself. Weakened walls which overhang a street and dangerous unguarded ditches and excavations which may adjoin a street render the street no less perilous than obstructions or depressions negligently permitted within the street itself.

In *Petersburg* v. *Applegarth's Administrator,* 28 Gratt. (69 Va.) 321, 26 Am. Rep. 357, a vessel struck a snag in the river and sank while it was being moored at a wharf owned by the city. It was held that it was not only the duty of the city to keep the wharf fit for the use of vessels and safe for persons using same, but it was also its duty to use ordinary care and diligence in keeping the water adjacent thereto free from obstructions.

In *Orme* v. *City of Richmond,* 79 Va. 86, the city was held liable for personal injuries to a passer-by resulting from its failure to erect a barrier to an excavation immediately on the side of a recently constructed street. This principle was approved in *Clark* v. *Richmond, supra,* where a recovery was denied on other grounds.

McQuillan Municipal Corporations (2d Ed.) section 2966, states the following rule:

"If a municipality has the power to declare and abate nuisances, and it has actual or constructive notice of the dangerous condition of a structure on private property so near the street as to threaten the safety of persons traveling thereon, it is liable to persons in the street injured by the fall of such structure, the negligence being the failure to remove the structure after knowledge of its condition and the apparent danger."

Thus, where a city is liable for failure to perform its ministerial duty, it is liable for its negligence in improperly performing such duty. It does not matter that the performance of the ministerial duty was for the peculiar benefit of persons other than the one injured. The liability of the city is based upon its negligence in the performance of its ministerial duty, not upon its relation to the persons peculiarly interested in the performance of the duty.

In the instant case, the officers of the city clearly recognized the perils caused by the weakened condition of the brick walls in close proximity to the streets. In recognition thereof, they roped and blocked the streets off from traffic during their razing operations. They placed some boards on the roof of the property of Burson, insufficient

to protect the roof. Their actions in this respect and the warning given of the likelihood of the danger to adjoining property served to show that they had notice of the danger. There is ample evidence of an improper, unskillful and negligent performance of duties imposed upon both them and the city.

The defendant urges that the fire department members were acting in the discharge of their duties as firemen. The evidence shows that the fire had been extinguished five days before the walls were razed. There was then no danger from fire and consequently no reason to order the destruction of the walls to prevent the spread of a fire. The agents and officers of the city were engaged in making the streets safe for passers-by. Neither the city manager nor the fire chief was acting in an emergency of a fire in progress. Sections 3133-3135, Virginia Code 1936, relating to the destruction of houses to prevent the spread of fire, have no bearing on this case.

The trial court gave five instructions to the jury, two for the plaintiff and three for the defendant. One instruction for the plaintiff related merely to the measure of damages. Two instructions for the defendant dealt with the burden of proof and the test of negligence. The other two instructions submitted to the jury questions of fact covering the respective theories and contentions of the parties.

The city objected to the following instruction:

"The court instructs the jury that if they believe from a preponderance of the evidence that the wall and elevator shaft was standing close enough to the public streets of the city of Bristol, Virginia, to render passage thereon by the public dangerous and hazardous to life and safety of persons passing along and on said streets, and that further, that the city manager and the fire chief in the performance of the duty of the city to keep its streets safe for passers thereon and were attempting to remove said elevator shaft and wall for such purposes, and did proceed with said work in a prudent and careful method and manner that would appear proper to prudent and careful men, then the

city is not liable; but if they find that said city proceeded in a careless and negligent manner, or in a manner that was not prudent and careful and that said careless and negligent conduct and methods of said city was the proximate cause of the damage to plaintiff then the jury shall find for plaintiff."

Among its grounds of objections, the city contended that it imposed too high a duty upon the defendant; that it allowed the jury to pass upon whether razing the wall was a governmental or ministerial act; that it did not show a violation of any duty to the plaintiff as a property owner; and that it omitted the city's defense of *ultra vires*. All of these objections are without merit.

The city excepted to the action of the trial court in refusing to give four specific instructions and in amending another offered instruction by striking therefrom (1) a provision which told the jury that the plaintiff was required to show that the walls were razed "upon the authority of the defendant's city council, which is its governing body," and (2) the statement that the "removal of debris and rubbage from the streets following a fire is a governmental function for which the city is not responsible in damages." The grounds of the city's objections are not given in the record.

The amended instruction, as given, was favorable to the city. The instructions refused were in conflict with those given. There was no error in the rulings of the court.

In the view we have taken, it is unnecessary to consider other grounds for recovery relied upon by the plaintiff, and, for the reasons stated, we are of opinion that the cross-assignments of error by the city are without merit.

Upon the whole record, we conclude that the city, under the facts in this case, is liable for damages inflicted upon the plaintiff's property by reason of the negligent acts of its officers and agents acting within the scope of their authority and in the performance of the ministerial duty of the city. It was the legal duty of the city to exercise reasonable care for the protection of its streets for public

travel, and it was engaged in the attempted performance of that duty, through its own agencies, when the negligence was committed.

The evidence is in conflict as to the amount of the damages; but the amount awarded by the jury is within the range set by the evidence and it is not unreasonable nor arbitrary.

The judgment of the trial court is reversed, the verdict of the jury reinstated, and final judgment is here entered for the plaintiff, M. E. Burson, with interest and costs.

*Reversed and final judgment.*