PRESENT: All the Justices

ROBBY NIESE
                                            OPINION BY
v.  Record No. 012007              JUSTICE DONALD W. LEMONS
                                          June 7, 2002
CITY OF ALEXANDRIA

          FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                      Alfred D. Swersky, Judge

     In this appeal, we consider whether the trial court erred in sustaining the City of Alexandria's (the "City") special plea of sovereign immunity and dismissing Robby Niese's ("Niese") motion for judgment.

                    I.   Facts and Proceedings Below

     The special plea of sovereign immunity was submitted to the trial court on the pleadings.  "[W]here no evidence is taken in support of a plea in bar, the trial court, and the appellate court upon review, consider solely the pleadings in resolving the issue presented."  Lostrangio v. Laingford, 261 Va. 495, 497, 544 S.E.2d 357, 358 (2001).  The facts as stated in the pleadings by the plaintiff are taken as true for the purpose of resolving the special plea.  Id.

     Niese's pleadings allege that during the summer of 1998, Niese was experiencing behavioral difficulties with her son, Steven Niese ("Steven").  Steven was admitted to This Way House, a group home and counseling center that provided services to troubled families.  In August 1998, Niese met Raleigh Harsley

("Harsley"), a City police officer, and sought his help with her son's problems. On September 1, Harsley visited Niese's place of employment in a marked police cruiser, where he told Niese that he wanted to "make a game plan for Steve." Harsley agreed to take Steven to the "Sports Orientation Night" at Steven's high school that evening.

Niese arrived at Steven's high school later that evening but she did not see her son at the event. When she located Harsley in the parking lot and inquired about her son, Harsley directed her into his marked police cruiser. Niese complied and when she again inquired about Steven, Harsley told Niese he would follow her to her home where they could discuss her son. After arriving at Niese's home, Harsley asked Niese to accompany him to a restaurant "to discuss her son." Niese rode in Harsley's marked police cruiser to the restaurant.

Niese's pleadings allege that Harsley subsequently drove her home and "insisted that he accompany Niese to her apartment." At the door, Harsley demanded to be admitted to the apartment in order to inspect Steven's bedroom. Niese allowed Harsley to enter the apartment, but when he asked to see Niese's bedroom, Niese refused and attempted to escort him from her apartment. At the front door, "Harsley suddenly grabbed Niese," overpowered her, and removed some of her clothing. Niese's pleadings alleged that over her repeated protests, Harsley

2

forcibly assaulted and raped her and then immediately exited the apartment.

Two days later, on September 3, Niese reported the rape, and the fact that the perpetrator was a City police officer, to a counselor with the City's Department of Mental Health. On September 6, she reported the rape to Chuck Selner, an administrator at This Way House.

On September 18, Harsley arrived at Niese's apartment complex in his marked police cruiser. Niese's pleadings allege that Harsley gained entrance to her apartment "by means of intimidation," where he raped Niese for the second time. During the middle to latter part of September, Niese learned that she was pregnant as a result of Harsley's rape. She informed Harsley of her pregnancy, and Harsley "insisted that Niese terminate the pregnancy." Harsley began contacting Niese by telephone and in person at Steven's high school, and he informed Niese that he would "not allow her to hurt him."

On October 2, in response to a demand from Harsley, Niese met him at the City Police Department to discuss the pregnancy. Niese's pleadings allege that Harsley then drove her to Washington D.C. and stopped his vehicle in a park area, where he raped Niese for the third time.

On October 5, Niese sought assistance from the Office on Women, Sexual Assault Response and Awareness Program ("SARA"), a

3

department under the authority and supervision of the City. Niese reported to Sara Donahue ("Donahue"), the SARA program director, that she had been raped by a City police officer. Donahue reported Niese's complaint to the City Police Department on October 7.

Also on October 7, Niese's pleadings allege that while seeking medical care related to her pregnancy, she reported the rapes and the identity of the perpetrator to the Alexandria Women's Health Clinic. Despite Niese's numerous reports to various City agencies, on October 8 Harsley arrived at Niese's apartment, directed her into his vehicle, drove to an empty parking lot in Arlington, and raped Niese for the fourth time.

On December 8, as a result of arrangements made by Donahue, Niese spoke with detectives from the City Police Department to discuss her original complaint of rape by Harsley. The City Police Department conducted an investigation of Niese's complaint, and as a result Harsley was terminated from his employment on February 3, 2000.

On August 31, 2000, Niese filed a motion for judgment against Harsley and the City, seeking compensatory and punitive damages for sexual assault and battery, intentional infliction of emotional distress, and negligent retention. In Count I, Niese alleged that Harsley, while acting as an employee and/or agent for the City, repeatedly sexually assaulted her. She

4

maintained that "[a]t all times relevant herein, Harsley was an employee of the City and was clothed with the authority of an Alexandria police officer. . . . [and he] was entrusted by the City with a marked Alexandria police cruiser," which he drove during many of his contacts with her. As a direct and proximate result of the sexual assaults, Niese alleged that she suffered severe and permanent emotional and mental injuries.

In Count II, she alleged that Harsley, while acting as an employee of the City, "through intentional threats and intimidation, produced fear of severe bodily injury to Niese and her son." She further alleged that Harsley "perpetrated outrageous and intolerable acts upon [her], which were offensive to the generally accepted standards of decency and morality." Niese alleged that she suffered "severe and permanent emotional distress" as the direct and proximate result of Harsley's conduct.

In Count III, Niese claimed that the City negligently retained Harsley as an employee after she sought assistance from the Department of Mental Health, a department of the City, and from SARA, another City department. Niese alleged that the City had either actual or constructive notice of the rapes and sexual assaults perpetrated by Harsley, and the City failed to exercise ordinary care in the investigation of her reports. She further alleged that the City failed to properly train its employees to

handle sexual assault and rape complaints. As a direct and proximate result of the City's negligent retention of Harsley, Niese alleged that she was repeatedly raped and suffered from severe and permanent emotional and mental injuries.

In Count IV, Niese sought punitive damages for the "acts and omissions of Harsley, while acting as an employee and/or agent for the City, and while clothed with the authority of an Alexandria police officer, and the acts and omissions of the City, by and through its employees and agents." Niese alleged that these acts and omissions constituted "willful, wanton and malicious" conduct and demonstrated a "conscious and utter disregard of Niese's rights, health and safety."

The City filed a special plea of sovereign immunity and asserted that the "maintenance and operation of a municipal police force is a governmental function, and a city is immune from lawsuits alleging negligence, including intentional torts in the provision of police service."

By letter opinion dated December 21, 2000, the trial court sustained the City's special plea of sovereign immunity to Counts I through III. The court noted that the doctrine of sovereign immunity protected the municipality from allegations of negligence by its police officers and held that "[i]t is generally accepted that the sovereign is immune from suit for the intentional, as well as negligent, torts of its employees

6

engaged in governmental functions."  On February 12, 2001, the trial court entered a consent order granting Niese leave to amend her pleadings.

Niese filed her amended motion for judgment on February 14, 2001.  In the amended motion she included Counts I through IV of the original motion for judgment and added two additional counts: Count V "Violation of Statutory Duties" and Count VI "Punitive Damages for Violation of Statutory Duties."

In Count V, Niese argued that the City's employees violated Code § 63.1-55.3, which placed an affirmative duty upon the Department of Mental Health counselor to whom Niese had reported the rape to immediately report the matter to the local law enforcement agency.  According to Niese, no report was ever generated and because the employees and staff of the Department of Mental Health were acting as agents and employees of the City, the City failed to perform its statutory duties pursuant to Code § 63.1-55.3.  Niese maintained that the reporting requirements were "ministerial not discretionary."[1]  Count VI requested punitive damages for the violations alleged in Count V.

The City filed a special plea of sovereign immunity to the amended motion for judgment.  In response to the allegation of a

violation of statutory duties, the City argued that "the provision of counseling and mental health care services by a municipal corporation to its citizens is the essence of the promotion of public health and well being, and therefore, is a governmental function."  Accordingly, the City maintained that it was immune from any and all liability arising out of the allegedly negligent failure by City employees to report the assaults.

By letter opinion dated May 23, 2001, the trial court sustained the City's special plea of sovereign immunity to Niese's amended bill of complaint.  The trial court held that the City was performing a governmental function when providing the mental health counseling and treatment; therefore, the trial court held that the City would be immune from suit even if its employees were not immune.  The court stated:

> Assuming, as the Court has here, that the [City] employees failed in the performance of a ministerial duty [to report under the statutes], the only way that the City itself could be liable is by the application of the doctrine of respondeat superior.  To impose liability upon the municipality or state for the negligent acts of its employees in the performance of ministerial duties while engaged in governmental functions emasculates the sovereign immunity doctrine.  See, Ashbury v. City of Norfolk, 152 Va. 278 [147 S.E. 223] (1929); James v. Jane, 221 Va. 43 [282 S.E.2d

---

¹ Niese further argued that alleged reporting requirements under Code § 37.1-84.1 were violated.  She has abandoned this argument on appeal.

864] (1980), wherein the Court distinguishes between the sovereign and its employees in imposing liability under these circumstances.

The trial court entered an order memorializing its decision on June 12, 2001. Having previously dismissed the City as a defendant to Counts I – III[2] of the amended motion for judgment, the trial court sustained the City's special plea of sovereign immunity to Counts V and VI of the amended motion and dismissed the City from the action with prejudice.[3] Niese appeals the judgment of the trial court.

## II. Analysis

On appeal, Niese asserts that the City is not protected by sovereign immunity for the intentional torts committed by Harsley while he was "functioning in a government capacity." Niese further argues that the City's negligent retention of Harsley, after receiving notice of his misconduct, is not protected by sovereign immunity. Finally, Niese maintains that the reporting requirement of Code § 63.1-55.3 is a ministerial act; accordingly, the City is not immune from liability for its employees' negligence in failing to report the sexual assaults.

The City argues that it acts in a governmental capacity when maintaining a police force. According to the City,

---

[2] Count IV sought punitive damages for the complaints alleged in Counts I through III.

9

> [w]hen a municipal corporation acts in its governmental capacity, it is considered to be an agency of the state and, therefore, it is not liable for damages to an individual who was injured by the wrongful act of an employee while the employee is engaged in the performance of the governmental function.

Therefore, the City maintains that it is not liable for the intentional torts of its employee committed while the employee was carrying out the governmental function.  The City further argues that decisions regarding the hiring and employing of an individual police officer are an "integral part" of the governmental function of providing a police force; accordingly, the City is protected by sovereign immunity for these acts. Finally, the City maintains that because the provision of mental health counseling is a governmental function, the City's immunity is not abrogated by its employees' failure to perform a ministerial task "as part of [his or] her employment with the City."

"[T]he doctrine of sovereign immunity is 'alive and well' in Virginia."  Messina v. Burden, 228 Va. 301, 307, 321 S.E.2d 657, 660 (1984).  It is well established that the doctrine of sovereign immunity protects municipalities from tort liability arising from the exercise of governmental functions.  Hoggard v.

---

[3] On July 25, 2001, the trial court entered an order to stay the proceedings against Harsley, pending a decision by this Court in this appeal.

10

<u>City of Richmond</u>, 172 Va. 145, 147-48, 200 S.E. 610, 611 (1939).

As we explained in <u>Hoggard</u>:

> [A] municipality is clothed with two-fold functions; one governmental, and the other private or proprietary. In the performance of a governmental function, the municipality acts as an agency of the state to enable it to better govern that portion of its people residing within its corporate limits. To this end there is delegated to, or imposed upon, a municipality, by the charter of its creation, powers and duties to be performed exclusively for the public. In the exercise of these governmental powers a municipal corporation is held to be exempt from liability for its failure to exercise them, and for the exercise of them in a negligent or improper manner. This immunity is based on the theory that the sovereign can not [sic] be sued without its consent, and that a designated agency of the sovereign is likewise immune.

> There are granted to a municipal corporation, in its corporate and proprietary character, privileges and powers to be exercised for its private advantage. . . . For an injury resulting from negligence in their exercise or performance, the municipality is liable in a civil action for damages in the same manner as an individual or private corporation.

<u>Id.</u>

In general, a municipality is immune from liability for negligence associated with the performance of "governmental" functions, but can be held liable for negligence associated with the performance of "proprietary" functions. <u>Id.</u>, <u>see</u> <u>also</u> <u>Burson v. City of Bristol</u>, 176 Va. 53, 63, 10 S.E.2d 541, 545 (1940). A function is governmental if it is "directly tied to

11

the health, safety, and welfare of the citizens." Edwards v. City of Portsmouth, 237 Va. 167, 171, 375 S.E.2d 747, 750 (1989). Stated another way, a governmental function involves "the exercise of an entity's political, discretionary, or legislative authority." Carter v. Chesterfield County Health Comm'n, 259 Va. 588, 591, 527 S.E.2d 783, 785 (2000) (citing First Va. Bank-Colonial v. Baker, 225 Va. 72, 301 S.E.2d 8 (1983)).

"[A] municipal corporation acts in its governmental capacity in . . . maintaining a police force." Hoggard, 172 Va. at 148, 200 S.E. at 611. Accordingly, a municipality is immune from liability for a police officer's negligence in the performance of his duties as a police officer.

Although this Court has not addressed the issue of a municipality's liability for an intentional tort committed by an employee in the performance of a governmental function, other courts have addressed the issue. For example, in Carter v. Morris, 164 F.3d 215 (4th Cir. 1999), Carter sued the City of Danville and others, asserting both federal claims under 42 U.S.C. § 1983 and state law tort claims arising out of her treatment by officers of the City of Danville Police Department. Id. at 217. The United States District Court for the Western District of Virginia granted summary judgment to the City on all of Carter's claims. Id. With respect to Carter's state law

12

tort claims against the City, the United States Court of Appeals for the Fourth Circuit affirmed and held that a City is immune from liability for the intentional torts of its employees.  Id. at 221.  The court explained that it could "find no authority that this immunity has been waived."  Id.  Furthermore, the court noted that the Virginia Tort Claims Act, which waives the state's immunity for certain claims, unequivocally states that the Act cannot be so construed as "to remove or in any way diminish the sovereign immunity of any county, city or town in the Commonwealth."  Id.; see Code § 8.01-195.3.

We agree with the reasoning of the Fourth Circuit and hold that a municipality is immune from liability for intentional torts committed by an employee during the performance of a governmental function.  In the present case, Harsley committed the alleged intentional torts against Niese during the ongoing investigation of her complaint concerning her son.  The investigation of a citizen's complaint is certainly part of the governmental function of providing a police force.  Accordingly, the City cannot be held liable for the alleged intentional torts committed by Harsley.

Niese next asserts that the City's retention of Harsley as a police officer, after receiving notice of his alleged misconduct, is negligence which is not protected by sovereign immunity.  Niese correctly notes that the independent tort of

13

negligent retention is recognized in Virginia.  Southeast

Apartments Mgmt., Inc. v. Jackman, 257 Va. 256, 260, 513 S.E.2d

395, 397 (1999).  However, the doctrine of sovereign immunity

protects municipalities from liability for negligence in the

performance of governmental functions.  As stated previously,

the maintenance of a police force is a governmental function.

Hoggard, 172 Va. at 148, 200 S.E. at 611.  The decision to

retain an individual police officer is an integral part of the

governmental function of maintaining a police force.

Accordingly, we hold that the City is immune from liability for

any negligence associated with its decision to retain a specific

police officer.

Niese urges this Court to adopt an exception to the rule of

sovereign immunity for the tort of negligent retention, as we

did with respect to the doctrine of charitable immunity for the

tort of negligent hiring.  See J. . . . v. Victory Tabernacle

Baptist Church, 236 Va. 206, 210, 372 S.E.2d 391, 394 (1988)

(holding that the independent tort of negligent hiring "operates

as an exception to the charitable immunity of religious

institutions").  In Messina, 228 Va. at 307-08, 321 S.E.2d at

660, we explained the purpose behind sovereign immunity as

follows:

> One of the most often repeated
> explanations for the rule of state immunity
> from suits in tort is the necessity to protect

14

the public purse.  However, protection of the public purse is but one of several purposes for the rule. . . . [S]overeign immunity is a privilege of sovereignty and . . . without the doctrine there would exist inconvenience and danger to the public in the form of officials being fearful and unwilling to carry out their public duties. . . . [I]f the sovereign could be sued at the instance of every citizen the State could be 'controlled in the use and disposition of the means required for the proper administration of the government.'

(Internal citations omitted).  The same purposes do not underlie the doctrine of charitable immunity and we decline to create an exception to the protection afforded by sovereign immunity for the independent tort of negligent retention.

Finally, Niese maintains that the reporting requirement in Code § 63.1-55.3 is "ministerial," and the City is not protected by sovereign immunity.[4]  The 1998 version of Code § 63.1–55.3(A) requires social workers, mental health professionals, and others "who [have] reason to suspect that an adult is an abused, neglected or exploited adult" to "immediately" report the suspected abuse to the local department of the city or county where the abuse was believed to have occurred.  Similarly, Code § 63.1–55.3(C) states that any person required to make a report in Code § 63.1-55.3(A) who has "reason to suspect" that an adult

---

[4] The question whether provision of mental health services by the City is a governmental function is not addressed in an assignment of error.

has been sexually abused "shall immediately report" the sexual abuse to the local law enforcement agency.

We have addressed the liability of cities and towns on numerous occasions and have never retreated from the rule articulated in Burson v. City of Bristol, 176 Va. 53, 63, 10 S.E.2d 541, 545 (1940), wherein we held:

> In this State, we have long determined the liability or non-liability of a city for acts committed by it according to whether the act was done in its governmental or proprietary character.  If the act be done in carrying out a governmental function, the city is not liable; if it be done in the exercise of some power of a private, proprietary or ministerial nature, the city is liable.

Niese's characterization of the reporting requirement as "ministerial" is incorrect.  The words, "who has reason to suspect that an adult is an abused, neglected or exploited adult," in Code § 63.1-55.3(A), require the exercise of judgment and discretion in concluding that a report must be made.  While individual cases may present patently obvious circumstances where reporting must take place, other cases may be subtle and more questionable.  We must focus upon the statute and not the circumstances in this case to determine whether the statutory duty is ministerial.  We hold that the provisions of Code § 63.1-55.3 applicable to this case impose a discretionary duty and not a ministerial duty upon those individuals with reporting requirements.

Accordingly, we will affirm the judgment of the trial court sustaining the City's plea of sovereign immunity.

Affirmed.