PRESENT: Hassell, C.J., Lacy, Keenan, Koontz, Lemons, and Agee, JJ., and Compton, S.J.

CITY OF CHESAPEAKE

v.  Record No. 032974

HELEN CUNNINGHAM

                                        OPINION BY
                                   JUSTICE G. STEVEN AGEE
                                      November 5, 2004

HELEN CUNNINGHAM

v.  Record No. 040002

CITY OF CHESAPEAKE


          FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
                        Norman Olitsky, Judge

     Helen Cunningham filed a thirteen-count motion for judgment against the City of Chesapeake ("the City") alleging that her August 30, 1998, miscarriage was caused by toxic water supplied by the City.  Counts I through IX of the motion for judgment allege breach of contract, breach of warranty, battery, negligence, nuisance, trespass and violation of the Virginia Consumer Protection Act.  Claims X through XIII allege claims of fraud.  Cunningham claimed compensatory damages of $5,000,000 and punitive damages of $1,000,000.[1]  In response, the City

---

[1] Cunningham is lead plaintiff of a combined group of 214 plaintiffs who allege that their miscarriages were caused by exposure to trihalomethanes in the City's water on various dates from 1984 through 2000.  These cases were combined for pretrial proceedings under the Virginia Multiple Claimants Litigation Act, Code § 8.01-267.1, et seq.  Each plaintiff requested compensatory and punitive damages.  The circuit court originally

entered special pleas of sovereign immunity and the statute of limitations.

The trial court sustained the plea of the statute of limitations as to Counts I through IX and dismissed those claims with prejudice. The trial court overruled the plea as to Counts X through XIII, denied the City's claim of sovereign immunity, and refused to dismiss Cunningham's prayer for punitive damages. Pursuant to Code § 8.01-267.8(B), the trial court made the requisite findings enabling the parties to proceed with an interlocutory appeal of the trial court's judgment.

The City assigned error to the trial court's denial of its special pleas of sovereign immunity and the statute of limitations as well as the refusal to strike Cunningham's prayer for punitive damages. Cunningham assigned error to the dismissal of her non-fraud claims. We awarded the respective parties appeals as to all these issues and consolidated the cases for hearing.

I.    BACKGROUND

Shortly after the City was formed in 1963, it commissioned engineering studies to find a reliable water source that would sustain future development. At that time, the City purchased most of its municipal water supply from the Cities of Norfolk

designated Merri Abernethy as the lead plaintiff; however, she nonsuited her case, and the court substituted Helen Cunningham as lead plaintiff.

2

and Portsmouth, which was expensive and potentially inadequate. This study recommended the Northwest River as a source of drinking water.

In May 1975, the U.S. Army Corps of Engineers granted the City a permit to withdraw water from the Northwest River and construct the Northwest River Treatment Plant ("the Plant"). The Plant was a conventional water treatment plant employing chlorine as a disinfectant, and its design was approved in 1977 by the Virginia Department of Health.  The Plant supplies most of the City's municipal water.

While the Plant was typical of its era, the Northwest River was an atypical water source, with then undiscovered problems. The river has high organic carbon levels.  When chlorine, a commonly used water purification chemical, is added it reacts with the naturally occurring organic matter in the water to form large amounts of trihalomethanes ("THMs").  At the time the Plant was designed, laboratory instrumentation to measure THMs was not in use, and THMs were not regulated contaminants.

In 1979, the Federal Safe Drinking Water Act, 42 U.S.C. §§ 300f et seq., required the Environmental Protection Agency (EPA) to publish a maximum contaminant level ("MCL") for each contaminant which "may have any adverse effect on the health of persons."  42 U.S.C. § 300g-1(b)(1)(A)(ii) (1976 & Supp. II 1979).  THMs, the byproducts of water chlorination, were first

3

identified for scientific analysis in 1974.  National Primary

Drinking Water Regulations; Disinfectants and Disinfection

Byproducts, 63 Fed. Reg. 69,390, 69,394 (Dec. 16, 1998)(codified

at 40 C.F.R. pts. 9, 141, and 142).  In November 1979, the EPA

set an annual average MCL for total trihalomethanes ("TTHMs")[2] of

0.10 mg/L or 100 parts per billion ("ppb").  National Interim

Primary Drinking Water Regulations; Control of Trihalomethanes

In Drinking Water, 44 Fed. Reg. 68,624, 68,624 (Nov. 29, 1979)

(codified at 40 C.F.R. pt. 141).  These new regulations became

binding on the City in November of 1983. Id. (providing an

effective date for the trihalomethane MCL of four years from

November 29, 1979, for water systems such as the City's).

Shortly after the Plant came online in March of 1980, the

City began sampling for THMs, finding levels that averaged

between 200 and 350 ppb.  The City retained Malcolm Pirnie,

Inc., an environmental engineering consulting firm, to evaluate

viable alternatives to reduce TTHM levels by the November 1983

regulatory effective date.

Malcolm Pirnie found that only two methods could

effectively reduce THMs from the Northwest River water.  The

---

[2] Throughout this opinion, "THMs" will refer to the class of
chemical compounds formed when chlorine reacts with organic
material in water.  "TTHMs" will refer to the group of
compounds, including chloroform, bromodichloromethane,
dibromochloromethane, and bromoform, as they are regulated by
the EPA.

City adopted both of Malcolm Pirnie's proposed solutions: chlorine dioxide disinfection in the short term and air stripping towers in the long term.[3]

Chlorine dioxide replaced chlorine as a water treatment medium in August of 1983 and had the immediate effect of reducing THMM levels within regulatory limits.  The air stripping system began operation in May 1985.  Despite constant monitoring and adjustment of the disinfectant and air stripping process, the Plant still periodically experienced high levels of THMs.  In August 1985, the City began adding ammonia after the air stripping process.  The ammonia combined with any free chlorine in the water supply in order to prevent the chlorine from reacting with organic material and forming THMs.  This combined treatment process enabled the City to generally meet the recognized THM limit of 100 ppb.

---

[3] The air stripping method was 70% of the cost of chlorine dioxide disinfection, but testing, designing and installing the air stripping towers would take at least a year.  In order to meet the deadline for regulatory compliance, the City immediately began chlorine dioxide disinfection.  Chlorine dioxide, unlike chlorine, combines less readily with the organic material in the Northwest River water, forming fewer THMs.  In the air stripping system, water was pumped from the bottom of a tower through the top and then left to trickle down through a packing material.  A high velocity air stream was simultaneously run through the water, effectively stripping THM compounds out of the water.  The THMs exited the tower through vents.  While the chlorine dioxide system sought to limit the formation of THMs, the air stripping system allowed them to form, and then separated them out of the water supply.

In 1997, anticipating stricter regulatory limits on TTHMs of 80 ppb, the City determined to replace the air stripping towers with a reverse osmosis system. While the air strip system could meet the 100 ppb limit, the new limit was "unattainable" with that technology.

The reverse osmosis system could meet the new TTHM limits, but the construction to modify the Plant necessitated an interim period during which neither the air strip or reverse osmosis system would be in operation, but chlorine disinfection would continue. Concerned that high TTHM levels during this period would push annual averages over 100 ppb and put the City in violation of applicable regulations, the City petitioned the State Health Commissioner ("Commissioner") for a temporary exemption from the water quality regulations, particularly the TTHM limitations.[4]

On June 11, 1998, the Commissioner granted the City's petition for exemption. In granting the exemption, the Commissioner found . . .

> . . . [(1)] a <u>compelling need for construction necessary to modify the Northwest River Water Treatment Plant</u> and to improve the safety of the drinking water it produces . . . [and (2)] <u>the granting of an exemption to the TTHMs</u>

---

[4] The Virginia Administrative Code governs a petition for temporary exemption in this circumstance. See 12 VAC 5-590-150.

> standard will not result in an unreasonable risk to the
> consumers' health.[5]

(Emphasis added).

In compliance with the exemption requirements, the City reported TTHM levels to the Virginia Department of Health ("VDH"), installed manganese contactors at the Plant to reduce TTHM levels, and posted public notice of the exemption in the Virginian-Pilot on July 9, 1998.[6]

The City began removing the air stripping towers at the Plant in preparation for the construction of the reverse osmosis system in February 1998. That same month, the Los Angeles Times reported that an unpublished study by the Reproductive Epidemiology Section of the California Department of Health Services ("the California study") found that daily consumption of more than five glasses of water with TTHM levels greater than 75 ppb increased the risk of spontaneous abortion for women in

---

[5] Additionally, the Virginia Department of Health ("VDH") placed the following conditions on the City: follow a schedule of compliance developed by VDH; monitor and report the concentration of TTHMs in the water supply as prescribed by VDH; operate the Plant in such a manner as to minimize TTHM production; and provide public notice as required by the Code.

[6] The notice explained the origin of THMs in the City's water supply and the known risks associated with consumption of THMs: increased risk of cancer from consuming 2 quarts of water daily that had THM levels in excess of 100 ppb over 70 years. As required, the notice provided an opportunity for a hearing on the exemption schedule. The City's Director of Public Communications also issued a press release on the exemption on July 8, 1998, and notice of the exemption was inserted into water bills. VDH terminated the exemption on June 4, 1999.

their first trimester of pregnancy.  Within two months of receiving a copy of the California study, the City undertook an extensive campaign to inform the public of the possible risks to women, who might become or were pregnant, of the possible effects of consuming City water during the exemption period while the air stripping towers were removed and the reverse osmosis system was being constructed.

The City and the Chesapeake Department of Health ("CDH") issued three separate papers publicizing the water warnings: a Public Health Bulletin ("the Bulletin") on March 31, 1998, and a news release ("the News Release") and public notice ("the Notice") on April 1, 1998.

These warnings summarized the results of the California study, explained that the City's TTHM levels would temporarily spike while the air stripping towers were off-line, and gave instructions for precautions pregnant women should take in the interim period.  These precautions included using primarily bottled water or boiling water before drinking.  In addition, the City set up recorded messages with health risk information and reports of weekly TTHM levels on the City's Water Quality Hotline and Answerline, a CDH phone bank.

CDH faxed the Bulletin to Chesapeake obstetricians and gynecologists, family practitioners, internists, CDH Supervisors, City officials, the Chesapeake Public School

8

Administration, newspapers, television and radio station news departments, Chesapeake General Hospital officials, Cox Communications and VDH officials. On March 31, 1998, CDH faxed a copy of the Bulletin to Cunningham's obstetrician, Dr. Timothy Hardy.

Media outlets provided extensive coverage of the water warnings. There were 22 television news reports between March 31, 1998 and May 4, 1998. The Virginian-Pilot included articles about the warning and Chesapeake's water quality 15 times from April 1 though December 21. The Chesapeake Post ran one article on April 17. Some articles contained listings of fire stations where affected residents could pick up free drinking water.

The City posted the Notice on its cable television bulletin board, at Public Utilities Department Offices, and on the City's Internet homepage. The City distributed copies to City libraries and recreation centers, mailed 73,062 copies of the Notice to all postal patrons in Chesapeake and sent 13,620 copies of the Notice home with elementary school students. Cunningham was a Chesapeake postal customer in April of 1998 but testified that she did not receive the Notice at that time "because people stole [her] mail."

The City began mailing copies of the Notice to new water customers in May of 1998 and continued until June 11, 1999. On September 21, 1998, Cunningham, then known by her maiden name,

9

Helen L. Stringfield, signed up for City water service. Ms. Stringfield's water service was activated on September 30, 1998. The New Customers Report run on October 1, 1998, lists "Stringfield[,] Helen L[.]" among 31 new customers.  The Department of Public Utilities received this report on October 2, 1998, and mailed a cover letter and Notice to Ms. Stringfield that day.

Cunningham claims that the City's water supply has historically exceeded regulatory limits for THMs, that the City knew that high levels of THMs were harmful to her health and that of her unborn child, that the City took steps to conceal both the high levels of THMs in the water and the deleterious effects on water consumers.  She alleges that when the City finally undertook a public notice campaign, that effort was inadequate because the City failed to inform her individually of the consequences of consuming City water.

The City argues that at the time the Plant was originally designed, THMs were not a recognized water contaminant and not regulated by the EPA.  The City maintains it thereafter consistently planned alternative designs to the Plant and the water treatment system in order to meet the required regulatory standards.  The City claims that the Plant's water has met EPA specifications since the air stripping towers came online in 1985.  Further, the City argues that the California Study

10

provided the first concrete evidence of a direct correlation between high TTHM levels and a specific health concern and that since receiving that study, the City has extensively publicized the risks to pregnant women.

Cunningham admits that she is not alleging that her miscarriage was the result of the cumulative effects of THMs or the result of any exposure prior to conception. Cunningham learned she was pregnant in July 1998 and miscarried on August 30, 1998. Thus, her claim of injury goes only to those acts occurring during the exemption period, which encompassed all of her pregnancy.

## II. ANALYSIS

We initially address the issue of sovereign immunity because, if it applies, all of Cunningham's claims are barred.

### A. The Law of Sovereign Immunity in Virginia

"[T]he doctrine of sovereign immunity is 'alive and well' in Virginia." Niese v. City of Alexandria, 264 Va. 230, 238, 564 S.E.2d 127, 132 (2002) (quoting Messina v. Burden, 228 Va. 301, 307, 321 S.E.2d 657, 660 (1984)). "Sovereign immunity is a rule of social policy, which protects the state from burdensome interference with the performance of its governmental functions and preserves its control over state funds, property, and instrumentalities." City of Virginia Beach v. Carmichael Dev. Co., 259 Va. 493, 499, 527 S.E.2d 778, 781 (2000) (internal

11

quotation marks omitted). A special plea of sovereign immunity, if proven, creates a bar to a plaintiff's claim of recovery. Tomlin v. McKenzie, 251 Va. 478, 480, 468 S.E.2d 882, 884 (1996).

The trial court conducted a hearing on the City's special plea and received pleadings with attached exhibits from the parties. Where no evidence is taken in support of the plea, the trial court, and the appellate court upon review, must rely solely upon the pleadings (which includes the voluminous attachments in this case) in resolving the issue presented. Id. The existence of sovereign immunity is a question of law that is reviewed de novo. See Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002) (citing Research Triangle Inst. v. Bd. of Governors of the Fed. Reserve Sys., 132 F.3d 985, 987 (4th Cir. 1997)).

In the context of sovereign immunity, Virginia municipal corporations exercise two types of functions: governmental and proprietary. Gambrell v. City of Norfolk, 267 Va. 353, 357-58, 593 S.E.2d 246, 249 (2004); Harrell v. City of Norfolk, 265 Va. 500, 502, 578 S.E.2d 756, 757 (2003); Niese, 264 Va. at 238, 564 S.E.2d at 132; Carmichael, 259 Va. at 499, 527 S.E.2d at 782; Fenon v. City of Norfolk, 203 Va. 551, 555, 125 S.E.2d 808, 811 (1962).

Governmental functions are powers and duties performed exclusively for the public welfare. Carmichael, 259 Va. at 499,

527 S.E.2d at 782 (citing Hoggard v. City of Richmond, 172 Va. 145, 147-48, 200 S.E. 610, 611 (1939)). A function is governmental if it entails the exercise of an entity's political, discretionary, or legislative authority. Carter v. Chesterfield County Health Comm'n, 259 Va. 588, 590-591, 527 S.E.2d 783, 785 (2000).

Proprietary functions are performed primarily for the benefit of the municipality. Carmichael, 259 Va. at 499, 527 S.E.2d at 782 (citing Hoggard, 172 Va. at 147-48, 200 S.E. at 611). If the function is a ministerial act and involves no discretion, it is proprietary. Carter, 259 Va. at 590-91, 527 S.E.2d at 785.

Sovereign immunity protects municipalities from tort liability arising from the exercise of governmental functions. Niese, 264 Va. at 238, 564 S.E.2d at 132 (citing Hoggard, 172 Va. at 147-48, 200 S.E.2d at 611). There is no municipal immunity, however, in the exercise of proprietary functions. Gambrell, 267 Va. at 357-58, 593 S.E.2d at 249; Carmichael, 259 Va. at 499, 527 S.E.2d at 782; Carter, 259 Va. at 590-91, 527 S.E.2d at 785.

This court has consistently held that when a municipality plans, designs, regulates or provides a service for the common good, it performs a governmental function. See, e.g., Maddox v. Commonwealth, 267 Va. 657, 663, 594 S.E.2d 567, 570 (2004) (plan

and design of a sidewalk); Bialk v. City of Hampton, 242 Va. 56, 59, 405 S.E.2d 619, 621 (1991)(provision of emergency snow removal services); Taylor v. City of Charlottesville, 240 Va. 367, 371, 397 S.E.2d 832, 835 (1990) (planning, designing, laying out of streets and roads); Edwards v. City of Portsmouth, 237 Va. 167, 172, 375 S.E.2d 747, 750 (1989) (provision of ambulance services); Freeman v. City of Norfolk, 221 Va. 57, 60, 266 S.E.2d 885, 886 (1980) (regulation of traffic through traffic signals); Transportation Inc. v. City of Falls Church, 219 Va. 1004, 1006, 254 S.E.2d 62, 64 (1979) (regulation of traffic); Fenon, 203 Va. at 556, 125 S.E.2d at 812 (provision of emergency cleanup services); Ashbury v. City of Norfolk, 152 Va. 278, 292, 147 S.E. 223, 227 (1929) (provision of garbage collection services).

In contrast, routine maintenance or operation of a municipal service is proprietary. Gambrell, 267 Va. at 357-58, 593 S.E.2d at 249; Carter, 259 Va. at 592, 527 S.E.2d at 785. See, e.g., City of Virginia Beach v. Flippen, 251 Va. 358, 362 467 S.E.2d 471, 474 (1996) (maintenance of sidewalks); City of Richmond v. Branch, 205 Va. 424, 428, 137 S.E.2d 882, 885 (1964) (routine maintenance of existing streets); City of Norfolk v. Hall, 175 Va. 545, 552, 9 S.E.2d 356, 360 (1940) (faulty maintenance or street construction); Chalkley v. City of Richmond, 88 Va. 402, 409, 14 S.E. 339, 341 (1891) (failure to

14

keep a sewer drain in repair and free from obstructions).

> B.    The Application of Sovereign Immunity in this Case

In response to the City's plea of sovereign immunity, Cunningham contends that "the defense of sovereign immunity is unavailable" to a municipality operating a water system.  In support of her argument, Cunningham cites our decisions in Richmond v. Virginia Bonded Warehouse Corp., 148 Va. 60, 138 S.E. 503 (1927), and Woods v. Town of Marion, 245 Va. 44, 425 S.E.2d 487 (1993).[7]

The City contends there is no unique rule for sovereign immunity claims related to a municipal waterworks, but that the principles of law are those applicable to other municipal acts. In that context, the City posits three grounds it claims establish sovereign immunity in this case.

Initially, the City argues its action in supplying purified water was undertaken for the health, safety and welfare of its citizens and is thus an immune governmental function.  Second, the City avers it "used its municipal discretion to design, construct and upgrade the . . . Plant," which is a legislative function protected from liability.  Finally, the City contends supplying purified water was the exercise of a power delegated

---

[7] Cunningham also cites our decision in Leonard v. Town of Waynesboro, 169 Va. 376, 193 S.E. 503 (1937), as authority for her position.  However, that case involved the liability of a municipality under a theory of quantum meruit for the construction of a water line.

by statute, Code § 15.2-2109, and is thus immune from claims as an exercise of the authority of the Commonwealth.

The distinction between a municipality's governmental and proprietary functions is more readily stated in theory rather than applied in actual practice. "Although the principles for differentiating governmental and proprietary functions are easily recited, as we have often noted, application of these principles has occasioned much difficulty." Carter, 259 Va. at 592, 527 S.E.2d at 785 (citing Ashbury, 152 Va. at 282, 147 S.E. at 224) (internal quotation marks omitted). Nonetheless, because we conclude the acts complained of by Cunningham were within the exercise of the City's discretionary legislative powers and thus a governmental function, we find the trial court erred in failing to sustain the City's plea of sovereign immunity.

Cunningham grounds her argument to bar the application of sovereign immunity on language first found in Richmond v. Virginia Bonded Warehouse Corp.

> [T]he operation of a water department for the purpose of supplying water for domestic and commercial purposes is a private or proprietary right, and for negligence in such operation a municipality is liable in like manner as a private individual.

148 Va. at 70-71, 138 S.E. at 506.

In Richmond, the plaintiff sought recovery against the City of Richmond for damages caused by the malfunction of its

16

sprinkler system when a city employee negligently turned on the water supply to the sprinkler system when it was under repair, ruining the goods in the warehouse.  148 Va. at 68-69, 138 S.E. at 505-06.  We found sovereign immunity did not apply to the negligent performance of a clearly ministerial act of routine maintenance.  Id. at 72, 138 S.E. at 507.  The planning and design of the municipal water system was not an issue in Richmond, so the analysis of sovereign immunity based on a discretionary legislative function was not before the Court.

Citing Richmond, we later held in Woods v. Town of Marion that sovereign immunity did not apply to shield the Town from liability.  245 Va. at 47, 425 S.E.2d at 489.  The Town failed to maintain its water pipes to prevent water from leaking onto a public street and forming ice that the Town subsequently neglected to remove for several weeks and by which the plaintiff was injured.  Id. at 45, 425 S.E.2d at 488.  Relying on these cases, Cunningham contends sovereign immunity cannot apply with regard to a municipal water system.  We disagree.

Neither Richmond nor Woods established a special rule barring sovereign immunity in any case involving a municipal water system.  These cases merely recognize that acts of negligence in routine maintenance of municipal water supply facilities are nonimmune ministerial acts of a proprietary function.  By contrast, in Stansbury v. City of Richmond, 116

Va. 205, 207, 81 S.E. 26, 27 (1914), we observed that "[t]he adoption of a plan for supplying a city . . . with water involves the exercise of a delegated governmental power; and an error of judgment with respect to the efficiency and adequacy of such systems is not in the first instance reviewable by the courts."

We held in Stansbury that sovereign immunity shielded the City from liability for a claim of inadequate water pressure from the municipal waterworks. Id. at 209-10, 81 S.E. at 27-28. While the water pressure at the plaintiff's home was initially inadequate, the City was reconfiguring its water system to correct the problem. Id. at 210, 81 S.E. at 28. In effect, the City was in a continuum of planning, designing and implementing the planned design of its municipal water service to provide appropriate water pressure. Sovereign immunity applied to protect the City because it was exercising its discretionary legislative power of designing the means to deliver water service. We quoted with approval the analysis in Johnston v. District of Columbia, 118 U.S. 19 (1886):

> The duties of the municipal authorities, in adopting a general plan of drainage, and determining when and where sewers shall be built, of what size and at what level, are of a quasi judicial nature, involving the exercise of deliberate judgment and large discretion, and depending upon considerations affecting the public health and general convenience . . . and the exercise of such judgment and discretion, in the selection and adoption of the general plan or system of drainage, is

18

> not subject to revision by a court or jury in a private action.

Stansbury, 116 Va. at 209, 81 S.E. at 27 (citing Johnston, 118 U.S. 19, 20-21 (1886)).

As Stansbury indicates, the planning, design and implementation of a municipal water system is no different than other municipal acts in the context of a sovereign immunity analysis.  By contrast, the municipal actions in the cases cited by Cunningham involve routine maintenance or clerical acts devoid of any nexus to a discretionary governmental function of design or planning.  Other than the fact that the acts in Richmond and Woods involved a water system, those claims are no different than those for negligent street maintenance or other clearly ministerial acts where sovereign immunity does not apply.

What we must determine is whether the City's action to take down the air stripping towers and reconstruct the Plant for the reverse osmosis system, thereby temporarily creating higher TTHM levels during the exemption period covering Cunningham's pregnancy and miscarriage, was a governmental or proprietary act.  It is the City's choice to change the design of its water treatment system which Cunningham has pled as the basis for the City's liability.  Specifically, Cunningham pled that the City was at fault in choosing the reverse osmosis system because "the

19

City could have, but did not, use other methods that reduce or eliminate THM contamination . . . [and] alternate water treatment methods could and should have been used."  For the following reasons, we find the City's action to be a governmental function in the exercise of its discretionary legislative powers.

The City's decision to move from the air stripping system to the reverse osmosis system was made in the interest of the public health.  In February of 1998, the California Study made the City aware that high TTHM levels had increased the risk of possible miscarriages.  The CDH had informed the City that it was "in the best interests of the health of the citizens of Chesapeake that the City transition to the new reverse osmosis plant" because "the high organics will never dissipate" and if the transition were not made, the City would "always be faced with the risk of high THMs,"  ultimately concluding that "the new plant poses a permanent solution to the problem and removes any future risk of spontaneous abortion related to THMs."  Thus, reverse osmosis could meet the new TTHM regulatory levels and the air stripping technology could not.  In that context, the Commissioner determined in granting the City's regulatory exemption that there was a "<u>compelling need for construction necessary to modify the Northwest River Water Treatment</u>

Plant. . .to improve the safety of the drinking water it produces."  (Emphasis added).

The City's decision to remove the air stripping towers and to construct the reverse osmosis system, with the knowledge that TTHM levels would rise, was an exercise of the City's legislative discretion and its inherent police power.  "[T]he determination of the public improvements to be made by a municipality [is] a legislative function."  Leonard v. Town of Waynesboro, 169 Va. 376, 385, 193 S.E. 503, 507 (1937). Deciding that the long-term gains to Chesapeake residents outweighed the short-term potential dangers to the public health, the City undertook the improvements and made an effort to alleviate the danger to the public by widely publicizing the known hazards to women who were or might become pregnant.  The Commissioner verified this decision as he "determined that the granting of an exemption to the TTHMs standard will not result in an unreasonable risk to the consumer's health."  Municipal decisions regarding the determination of priorities directly related to the general health, safety and welfare of citizens are exercises of a governmental function.  See Gambrell, 267 Va. at 359, 593 S.E.2d at 250.

The City's exercise of its legislative discretion to redesign the Plant by replacing the air stripping towers with the reverse osmosis facility is no different than a

municipality's design and planning of a roadway, even if other design alternatives were available.

> A municipal corporation, in selecting and adopting a plan for the construction of a public street, acts in a discretionary, governmental capacity and is immune from liability for injuries resulting from its errors in judgment made in that capacity.

Taylor, 240 Va. at 371, 397 S.E.2d at 835 (citing Hall, 175 Va. at 551, 9 S.E.2d at 359).

Cunningham acknowledges on brief that "the City may have exercised discretion in establishing the Northwest River Plant," but argues all acts after the initial design decision are per se proprietary functions. We rejected that notion in Stansbury where the City of Richmond was not in the initial construction of a water system but in a continuum of planning and redesigning the existing system just as the City did in the case at bar. We also find no authority for Cunningham's proposition that municipal design and planning as a discretionary legislative function is frozen in time, never to be subject to redesign or planning at any point.

The City's ongoing redesign and planning of its municipal water system is no different than the design or redesign of its streets and other facilities that may change from time to time. Even assuming there could be elements of the operation of a water system mixed with the planning and design elements, we have noted on many occasions "when governmental and proprietary

22

functions coincide, the governmental function is the overriding factor and the doctrine of sovereign immunity will shield the locality from liability." Carmichael, 259 Va. at 499, 527 S.E.2d at 782 (internal quotation marks omitted).

Cunningham further alleges that the City did not provide adequate information of the water supply's known risks to pregnant women. Like weighing priorities in making public improvements, the dissemination of information to the public is also a governmental function. Downs v. City of Southfield, 2001 Mich. App. LEXIS 2057 at *2 (Mich. Ct. App. 2001) (non-precedential decisions). See also Allen v. United States, 816 F.2d 1417, 1423 (10th Cir. 1987) (concluding that the government was immune from liability for the failure of the Atomic Energy Commission administrators and employees to warn the public about possible dangers more fully than they had); Loughlin v. United States, 286 F. Supp. 2d 1, 23 (D. D.C. 2003) (finding that the Army's decision not to issue warnings about munitions burials is a protected policy judgment); Valdez v. United States, 56 F.3d 1177, 1180 (9th Cir. 1995)(government decision not to bring the existence of a natural hazard to the attention of the public is discretionary). Accordingly, sovereign immunity also applies to the governmental function of providing notice and bars Cunningham's claim in that regard.

## III. CONCLUSION

Because we find that the City's redesign and planning of the Plant and its public information campaign regarding temporary risks associated with consuming City water were governmental functions, sovereign immunity applies to bar Cunningham's claims.  The trial court thus erred in denying the City's plea of sovereign immunity.[8]

The judgment of the trial court will be affirmed in part as to the dismissal of counts I to IX of the motion for judgment.  The judgment of the trial court will be reversed in part as to the failure to dismiss the remaining counts of the motion for judgment and the claim of punitive damages.  Final judgment will be entered for the City.

<u>Affirmed in part,</u>
<u>reversed in part,</u>
<u>and final judgment</u>.

_____

[8] As the application of sovereign immunity bars all of Cunningham's claims, it is unnecessary to address any other assignments of error.  Furthermore, having determined the City's acts were of a discretionary legislative function, we do not address the City's other proffered grounds for the application of sovereign immunity.