# COURT OF APPEALS OF VIRGINIA

Present:    Chief Judge Decker, Judges Raphael and White
Argued by videoconference


THE EPISCOPAL DIOCESE OF SOUTHERN
  VIRGINIA, ET AL.
                                                           OPINION BY
v.      Record No. 1955-23-2                      JUDGE STUART A. RAPHAEL
                                                           JULY 16, 2024
ROBERT K. MARSHALL, ET AL.


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Edward A. Robbins, Jr., Judge

Anne G. Bibeau (W. Thomas Chappell; Pietro Sanitate; Woods
Rogers Vandeventer Black PLC, on briefs), for appellants.

Joshua Farmer (Farmer Legal, PLLC, on brief), for appellees.

Amicus Curiae: Commonwealth of Virginia; M. Jordan Minot,
Assistant Solicitor General (Jason S. Miyares, Attorney General;
Erika L. Maley, Solicitor General; Kevin M. Gallagher, Principal
Deputy Solicitor General, on brief), for appellants.


The Court granted review in this interlocutory appeal to decide if the ecclesiastical-abstention doctrine applies to a claim for defamation per se filed by a former Episcopal priest against the diocesan bishop who deposed him from the ministry. We find that the defamation claim is inextricably intertwined with the disciplinary proceedings that led to the priest's ouster. In addition, the trier of fact would have to decide if the priest committed "sexual misconduct" within the meaning of canon law, which proscribes a broader swath of conduct than secular law. Accordingly, we hold that the defamation claim is barred by the protections for religious liberty in the First Amendment of the United States Constitution and in Article I, Section 16 of the Virginia Constitution.

The two plaintiffs in this case are Robert K. Marshall and his wife, Tatiana C. Marshall. The three defendants are the Episcopal Church, the Episcopal Diocese of Southern Virginia, and the Right Reverend Susan B. Haynes. Bishop Haynes was sued "both individually and in her official capacity" as the diocesan bishop. The only claim at issue here is Count XI. That count alleges that Bishop Haynes committed defamation per se in May 2022 when she told the congregation of the Episcopal Church of Redeemer–Midlothian ("Redeemer") that Marshall had engaged in sexual misconduct and that he had admitted as much. The trial court overruled Bishop Haynes's plea in bar, holding that the ecclesiastical-abstention doctrine was not implicated. We summarize the facts relevant to that claim.

Marshall became a priest in the Episcopal Church in 2006. A decade later, he moved his family to Chesterfield County, where he became the rector at Redeemer.[2]

In 2021, Marshall interviewed a prospective church employee, Jane Doe, whom he hired. At the end of Doe's job interview, Marshall placed his hand on the small of her back as he ushered her out. That incident was witnessed by "Roe," another church employee. Although Roe found Marshall's conduct inappropriate, Doe did not think so at the time. Doe later told Marshall that she was interested in becoming a priest, and he was happy to counsel her.

Over the next several months, Marshall often made Doe feel uncomfortable because she viewed his remarks as inappropriate sexual advances:

---

[1] In adjudicating the plea in bar, the trial court considered Marshall's complaint and several documents attached to the plea in bar. *See City of Chesapeake v. Cunningham*, 268 Va. 624, 633 (2004) ("Where no evidence is taken in support of the plea, the trial court, and the appellate court upon review, must rely solely upon the pleadings (which includes the voluminous attachments in [the] case) in resolving the issue presented.").

[2] Marshall states that the rector is the "clergy member . . . in charge of a particular parish." Compl. ¶ 14 n.1.

- At a church event on Christmas Eve, Marshall told Doe that she looked "pretty" and said that she would be "a great catch."

- Marshall asked Doe why she was still single, predicting that she would "make a man very happy" someday.

- Marshall told Doe after a church service that he enjoyed seeing her sitting with his daughter in the congregation.

- Marshall shared with Doe that a parishioner once said that she was in love with him.

- And Marshall repeatedly told Doe that he missed their regular Monday meetings when they had to be canceled or rescheduled.

Events came to a head in the spring of 2022. When Marshall invited Doe to lunch on Valentine's Day, Doe felt that "the invitation was inappropriate because of the symbolism associated with that day." A week later, when Doe asked Marshall to lunch, Marshall told Doe that the invitation made him "feel like a giddy eighth grader." Doe interpreted that remark too as an inappropriate sexual reference. Afterward, Doe shared her concerns with Roe.

On March 7, 2022, Doe initiated a "Title IV complaint" against Marshall, listing the grievances described above. "Title IV" refers to the canons that govern ecclesiastical discipline in the Episcopal Church.[3] The associate rector who received Doe's complaint promptly referred it to Bishop Haynes. The next day, Bishop Haynes placed Marshall on administrative leave, telling him that the complaint described "inappropriate comments . . . regarding [Doe's] appearance and marital status and [Marshall's] feelings about being with her," which "[Doe] perceived . . . as harassment." Although the intake report is not in the record, Marshall pleads (and we take as true) that the report "did not allege" that Marshall had "engaged in any form of inappropriate sexual touching."

---

[3] The 2018 edition of the canons are included in the record. *See also Constitution and Canons, Together with the Rules of Order, for the Governance of the Protestant Episcopal Church in the United States of America* (2018), https://perma.cc/92Q9-YKUZ.

An investigator for the Diocese looked into the allegations and met with Marshall. Marshall did not remember telling Doe that she was "pretty," but he said if he did, he meant it as a "compliment, not a sexual advance." Marshall denied telling Doe that she would be a "great catch" or "make a man very happy." He did not recall asking why Doe was still single. He admitted saying he missed it when they could not have their regular meetings. Marshall remembered his giddy-like-an-eighth-grader remark, but he denied it was sexual in nature. He said he was just excited that Doe had asked for his help in becoming a minister. Marshall denied that his lunch invitation on Valentine's Day was a romantic gesture. Finally, Marshall did not remember touching Doe's back during her job interview, but he acknowledged that he could have done so when escorting her from one place to another.

On April 8, the investigator delivered a report to Bishop Haynes. The report (which is also not in the record) said that Marshall had "agreed that most of the eleven interactions took place," although Marshall alleges that the rest of the report contradicted that assessment. Compl. ¶ 52. The investigator wrote that Marshall had "expressed astonishment" that his behaviors "would be seen as sexual misconduct," but Marshall was willing "to apologize to Doe." Compl. ¶¶ 55-56. The investigator posited two possibilities: that Marshall was trying "to avoid the consequences of his actions"; or that Marshall "truly did not understand" that his behavior could be construed as "sexual misconduct." Compl. ¶ 57.

Bishop Haynes met with Marshall and encouraged him to undergo a "one-week 'fitness to practice'" evaluation in Kansas. The evaluation would include, among other things, "a polygraph test to determine whether he was being truthful, and whether it would be appropriate for him to continue as a priest." Marshall understood that the outcome "would determine" whether the Diocese "could move forward with a process of restoration and reconciliation—or

- 4 -

whether [Marshall's] situation was more dire." Marshall agreed and departed for Kansas on Sunday, May 1, 2022.

That same day, Bishop Haynes met with the congregation at Redeemer "to discuss the investigation with all of the parishioners who were present for that Sunday's worship." Marshall's complaint compiles a long list of the bishop's allegedly false statements to the congregation, labeling them "*The Bishop's Lies.*" Compl. at 12. Bishop Haynes told the congregation that Marshall was the subject of a complaint that "involved sexual harassment and, specifically, boundary violations of a sexual nature." Compl. ¶ 64. Marshall pleads that Bishop Haynes intended parishioners to think the worst, "allowing time for the crowd to work itself up to a frenzy of audible murmurs." Compl. ¶¶ 65-66.

Marshall claims that the bishop falsely stated that the investigator had "determined that the allegations had merit." Compl. ¶ 67. He says that the bishop falsely stated that Marshall had admitted to the improper conduct. Compl. ¶¶ 75-76. He pleads that Bishop Haynes also lied when she claimed that the church had followed the process required under ecclesiastical law. To the contrary, Bishop Haynes "knew or should have known that her statement was not true" because the Diocese "had not followed the 'whole process' provided for in Title IV—or anything close to it." Compl. ¶¶ 68-70. For instance, Marshall had not yet met with the Title IV "Conference Panel," which was responsible for recommending a response to the bishop. Compl. ¶ 71 & n.4. Nor had Marshall had a hearing before the Title IV "Hearing Panel," which was responsible for making a "final determination." Compl. ¶ 72 & n.5.

Marshall alleges that Bishop Haynes exacerbated the parishioners' concerns by how she answered their questions. When asked if the allegations involved children, she was "noncommittal," and "ambiguous," saying things like: "Not that I am aware of at this time," and "I don't believe the school is involved." Compl. ¶ 88. She was also elliptical about the actual

sexual-misconduct allegations, saying only that they "crossed the line" of appropriate conduct for a priest:

> So, the Title IV Complaint involves sexual harassment. And, specifically, boundary violations of a sexual nature . . . so . . . this was a way to let you know that . . . there were verbal behaviors and physical behaviors *that crossed the line of what is appropriate between a priest and a parishioner or staff person . . . .*

Compl. ¶ 93 (emphasis added). When one parishioner asked if the complaint involved innocent behavior that was misinterpreted, Bishop Haynes responded no, "*That's not what we're dealing with.*" Compl. ¶¶ 96-97.

In July 2022, having been influenced by Bishop Haynes's statements, the Vestry[4] of Redeemer asked the bishop to sever ties with Marshall and to "bypass the remainder of the Title IV process." Compl. ¶¶ 126, 129, 133. Marshall claims that the "Vestry's vote was cast under the pretext of a Title III action." Compl. ¶ 127. He says that Title III of the canons "allows the Vestry to sever ties with a clergy member if it determines that the relationship between the priest and the church has been irreparably damaged." Compl. ¶ 128. Marshall paints the "shift to Title III" as a "way for [the Diocese] to resolve the situation without the burden of a fair and complete Title IV process." Compl. ¶ 132. Marshall adds that the Vestry wrote in a letter that it had relied on Bishop Haynes's representation that Marshall "violated" Title IV, that Marshall had been accused of "sexual harassment," and that he had "admitted the allegations were true." Compl. ¶ 133. The letter said that the "sexual harassment entailed both verbal and physical boundary violations." *Id.*

Marshall's complaint did not attach the October 13, 2022 order of the Conference Panel before the Disciplinary Board of the Episcopal Diocese, but the trial court received it as part of

---

[4] According to Marshall, the *Vestry* "refers to a group of parishioners who serve in a role similar to a board of directors overseeing a particular parish" in the Episcopal Church. Compl. at 6 n.2.

- 6 -

the bishop's plea in bar. The order was addressed to Bishop Haynes and reflects that Marshall was represented by counsel at two days of hearings. The Conference Panel found that Marshall "committed an Offense of Sexual Misconduct, as described in Title IV 4.1.h.(1)." It also found that Marshall "has committed Offenses of Conduct Unbecoming [of] a Member of the Clergy (defined as any disorder or neglect that prejudices the reputation, good order and discipline of the Church, or any conduct of a nature to bring material discredit upon the Church or the Holy Orders conferred by the Church)." The Panel recommended that Marshall "be deposed from ministry and [from] the exercise of all gifts of ministry conferred by ordination."

On November 2, 2022, Bishop Haynes adopted that recommendation and deposed Marshall from the ministry. Her "Bishop's Pronouncement of Sentence" recited the procedural history of the disciplinary proceedings, including the "findings of fact and recommended disciplinary sanctions" by the Conference Panel.

Nine days later, Marshall and his wife sued the Episcopal Church, the Episcopal Diocese of Southern Virginia, and Bishop Haynes. The complaint asserted four similar counts against each defendant: ordinary and gross negligence (Counts I, V, IX); defamation by implication (Counts II, VI, X); defamation per se (Counts III, VII, and XI); and intentional infliction of emotional distress (Counts IV, VIII, and XII). All three defendants filed pleas in bar invoking ecclesiastical abstention. Marshall later withdrew the three negligence counts, and the trial court dismissed them with prejudice.

After briefing and oral argument, the trial court sustained the defendants' pleas in bar to the remaining counts except Count XI, the claim for defamation per se against Bishop Haynes. The court's letter opinion explained that the intentional-tort claims against the Episcopal Church and the Diocese "would require an examination of church governance, doctrine, and organization." Citing *Jae-Woo Cha v. Korean Presbyterian Church*, 262 Va. 604 (2001), the

court ruled that such matters were beyond the court's jurisdiction. On the other hand, citing

*Bowie v. Murphy*, 271 Va. 127 (2006), the court held that Count XI was not barred and could be resolved without "judicial inquiry into any prohibited religious matter." The court overruled Bishop Haynes's plea in bar to that count and denied her motion for reconsideration.

The trial court, however, granted Bishop Haynes's motion to certify the order for interlocutory appeal under Code § 8.01-675.5, staying further proceedings pending resolution of this appeal. Marshall joined in the certification request, both in the trial court and here.[5] We granted the petition for appeal and now reverse.

STANDARD OF REVIEW

Whether the doctrine of ecclesiastical abstention bars Marshall's claim for defamation per se against Bishop Haynes presents a question of law that we review de novo. *See City of Chesapeake v. Cunningham*, 268 Va. 624, 633 (2004). The trial court characterized the controlling question of law as:

> Whether the defamation *per se* claim, that Bishop Haynes defamed [Marshall] by stating that he admitted to "behaviors that crossed the line of what is appropriate between a priest and a parishioner or staff person," is outside the jurisdiction of civil courts as it involves issues of church governance, faith, and doctrine, and is therefore barred by the First Amendment of the U.S. Constitution and Article I, § 16 of the Virginia Constitution.

Although that language quotes paragraph 93 of Marshall's complaint, Marshall maintained at oral argument that the defamatory words on which he relies are also in paragraphs 96 and 97.

---

[5] Before the 2020 amendment, 2020 Va. Acts ch. 907, an interlocutory appeal under what was then Code § 8.01-670.1 required the consent of all parties. *See Kittrell v. Fowler*, 301 Va. 25, 28 (2022) (per curiam). The 2020 amendment eliminated that mutuality requirement. The interlocutory-appeal mechanism in Code § 8.01-670.1 (part of Chapter 26, "Appeals to the Supreme Court") was moved to Code § 8.01-675.5 (part of Chapter 26.1, "Appeals to the Court of Appeals"), as part of the General Assembly's expansion of the jurisdiction of the Court of Appeals. *See* 2021 Va. Acts Spec. Sess. I ch. 489, at 1504-05, 1539.

Under Code § 8.01-675.5, we review the *order* that was certified for interlocutory appeal. We are not constrained by how the lower court characterized the controlling question of law that warranted interlocutory review. *See* Code § 8.01-675.5(A) (providing for certification of "such order or decree for interlocutory appeal" when "the order or decree involves a [controlling] question of law," providing for "an appeal to be taken from the interlocutory order or decree").[6]

ANALYSIS

The First Amendment to the Constitution of the United States proclaims that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  Although those provisions speak to actions by Congress, they also bind the States under the due process clause of the Fourteenth Amendment.  *See Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940) (free exercise clause); *Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947) (establishment clause).  Taken together, these two "Religion Clauses protect the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion."  *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020) (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012)).  "Both Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers."  *Hosanna-Tabor*, 565 U.S. at 181; *Bowie*, 271 Va. at 133 ("First Amendment jurisprudence is clear . . . that 'civil courts are not a constitutionally

---

[6] The text of Code § 8.01-675.5(A) resembles 28 U.S.C. § 1292(b), the federal interlocutory-appeal statute.  Like the Virginia statute, the federal statute provides for appellate review of the interlocutory order, not the legal question as framed by the lower court.  *See Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996) ("As the text of § 1292(b) indicates, appellate jurisdiction applies to the *order* certified to the court of appeals, and [review] is not tied to the particular question formulated by the district court.  The court of appeals may not reach beyond the certified order to address other orders made in the case.  But the appellate court may address any issue fairly included within the certified order because 'it is the *order* that is appealable, and not the controlling question identified by the district court.'" (citation omitted) (quoting 9 J. Moore & B. Ward, *Moore's Federal Practice* P110.25[1], p. 300 (2d ed. 1995))).

permissible forum for a review of ecclesiastical disputes.'" (quoting *Jae-Woo Cha*, 262 Va. at 610)).

The Constitution of Virginia independently protects religious liberty in the Commonwealth. "The 'constitutional guarantees of religious freedom have no deeper roots than in Virginia, where they originated, and nowhere have they been more scrupulously observed.'" *Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 528 (2023) (quoting *Reid v. Gholson*, 229 Va. 179, 187 (1985)). Article I, Section 16 of the Virginia Constitution provides (in part) that "all men are equally entitled to the free exercise of religion, according to the dictates of conscience" and that "[n]o man . . . shall otherwise suffer on account of his religious opinions or belief; but all men shall be free to profess and by argument to maintain their opinions in matters of religion, and the same shall in nowise diminish, enlarge, or affect their civil capacities." The first sentence "has been in the Constitution of Virginia since 1776." *Vlaming*, 302 Va. at 529. The second, drawn from Thomas Jefferson's Statute for Religious Freedom, "first appeared in the 1830 Constitution." *Id.* The text of the original Statute for Religious Freedom is also codified at Code § 57-1. The General Assembly has said that the statute expresses "the natural and unalienable rights of mankind" and "the policy of the commonwealth of Virginia." Code § 57-2.

Bishop Haynes based her plea in bar on the protections for religious liberty in both the Virginia and federal constitutions. *Vlaming* teaches that the Virginia Constitution provides more robust protections for religious liberty than the First Amendment. 302 Va. at 544 (rejecting the standard in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), as prescribing the applicable standard for evaluating free-exercise claims under the Virginia Constitution). But we need not break new ground to measure those differences here, since existing constitutional doctrine suffices to resolve this dispute.

"The independence of religious institutions in matters of 'faith and doctrine' is closely linked to independence in . . . 'matters of church government.'" *Our Lady of Guadalupe*, 591 U.S. at 746 (quoting *Hosanna-Tabor*, 565 U.S. at 186). That independence does not give religious institutions "general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.* "And a component of this autonomy is the selection of the individuals who play certain key roles." *Id.*

Federal and State courts have not been consistent in what they call this doctrine. We use the "ecclesiastical-abstention doctrine," which we think best captures the idea.[7]

The constitutional guaranties of religious liberty protect the freedom of a religious institution to select and dismiss its religious leaders. "The members of a religious group put their faith in the hands of their ministers." *Hosanna-Tabor*, 565 U.S. at 188. If the State imposed "an unwanted minister," it would "infringe[] the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments." *Id.* If the State were "to determine which individuals will minister to the faithful," it would "also violate[] the

---

[7] Our Supreme Court has not yet named the doctrine but has described its function: "The constitutional guarantees of religious freedom . . . prohibit the civil courts from resolving ecclesiastical disputes [that] depend upon inquiry into questions of faith or doctrine." *Jae-Woo Cha*, 262 Va. at 610 (quoting *Reid*, 229 Va. at 187). Several courts have called this the "ecclesiastical abstention" doctrine. *E.g.*, *In re Diocese of Lubbock*, 624 S.W.3d 506, 513 (Tex. 2021); *Pfeil v. St. Matthews Evangelical Lutheran Church of the Unaltered Augsburg Confession of Worthington*, 877 N.W.2d 528, 534 (Minn. 2016); *Rimer v. Seiler*, 111 Va. Cir. 192, 193 (Norfolk 2023). Others call it the "church autonomy" doctrine. *E.g.*, *Our Lady of Guadalupe*, 591 U.S. at 747; *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 323 (4th Cir. 2024). The Supreme Court of the United States has called it the "ministerial exception," *e.g.*, *Our Lady of Guadalupe*, 591 U.S. at 737, 746; *Hosanna-Tabor*, 565 U.S. at 188, though some lower courts have said that "[t]he 'ministerial exception' refers to the application of the doctrine in the employment context," *Torralva v. Peloquin*, 399 S.W.3d 690, 695 (Tex. Ct. App. 2013). Another lower court captured all three references, stating that the "ministerial exception" is simply "one branch of the ecclesiastical abstention doctrine, which is also referred to as the church autonomy doctrine." *Middleton v. United Church of Christ Bd.*, 483 F. Supp. 3d 489, 497 (N.D. Ohio 2020).

Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." *Id.* at 189. As a result, "it is impermissible for the government to contradict a church's determination of who can act as its ministers." *Id.* at 185; *see also Our Lady of Guadalupe*, 591 U.S. at 768 (Sotomayor, J., dissenting) (agreeing that "a religious entity's ability to choose its faith leaders—rabbis, priests, nuns, imams, ministers, to name a few—should be free from government interference").

The Religion Clauses likewise protect the decision-making autonomy of hierarchical religious organizations—including the Episcopal Church—in matters involving the discipline of clergy. "[T]he First Amendment 'permit[s] hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters.'" *Hosanna-Tabor*, 565 U.S. at 187 (second alteration in original) (quoting *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 724 (1976)). "When ecclesiastical tribunals decide such disputes, . . . 'the Constitution requires that civil courts accept their decisions as binding upon them.'" *Id.* (quoting *Serbian E. Orthodox*, 426 U.S. at 725). As our own Supreme Court put it in *Reid*, "the civil courts will treat a decision by a governing body or internal tribunal of a[] hierarchical church as an ecclesiastical determination constitutionally immune from judicial review." 229 Va. at 189.

To do otherwise would be unconstitutional. For instance, "inquiring into whether the Church ha[s] followed its own procedures" intrudes into "'quintessentially religious controversies whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals' of the Church." *Hosanna-Tabor*, 565 U.S. at 187 (quoting *Serbian E. Orthodox*, 426 U.S. at 720). Ecclesiastical determinations are not like decisions by governmental agencies. They cannot be tested for compliance with "[c]onstitutional concepts of due process, involving secular notions of 'fundamental fairness.'" *Serbian E. Orthodox*, 426

U.S. at 715.  Instead, "it is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria."  *Id.* at 714-15 (footnote omitted).

The Supreme Court has also warned that "courts must take care to avoid 'resolving underlying controversies over religious doctrine.'"  *Our Lady of Guadalupe*, 591 U.S. at 751 n.10 (quoting *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969)).  For instance, "the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice."  *Jones v. Wolf*, 443 U.S. 595, 602 (1979).  Secular courts must also steer clear of "church disputes over church polity and church administration."  *Serbian E. Orthodox*, 426 U.S. at 710; *see also Pure Presbyterian Church of Wash. v. Grace of God Presbyterian Church*, 296 Va. 42, 52 (2018) (summarizing "two related principles: first, that civil courts should not decide ecclesiastical questions; and second, that churches have a First Amendment right to be free from state interference in their internal affairs" (quoting Michael W. McConnel & Luke W. Goodrich, *On Resolving Church Property Disputes*, 58 Ariz. L. Rev. 307, 316 (2016))).

Our Supreme Court has treated the ecclesiastical-abstention doctrine as a question of jurisdictional significance: "issues of religious governance are unquestionably outside the jurisdiction of the civil courts."  *Protestant Episcopal Church v. Truro Church*, 280 Va. 6, 26 (2010).  In other words, "[a]s a general rule, courts lack subject matter jurisdiction to resolve issues of church governance and disputes over religious doctrine."  *Pure Presbyterian Church*, 296 Va. at 51 (quoting *Bowie*, 271 Va. at 133).[8]

---

[8] The idea that the ecclesiastical-abstention doctrine is "jurisdictional" may have its roots in *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871), where the Court said that when the controversy is "strictly and purely ecclesiastical in its character," then "civil courts exercise no jurisdiction."  *Id.* at 733.  This case does not require that we plumb the jurisprudential basis (or the consequences, if any) of characterizing the ecclesiastical-abstention doctrine as jurisdictional.

Still, a secular court may adjudicate controversies arising in religious settings if it can do so based on "neutral principles of law" that are "completely secular in operation." *Jones*, 443 U.S. at 602-03. For instance, a church-property dispute might be resolved "on the basis of the language of the deeds, the terms of the local church charters, the state statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property." *Id.* at 603. The governing documents, however, must be evaluated "in purely secular terms," and the court cannot "rely on religious precepts." *Id.* at 604.

Our Supreme Court has twice considered the neutral-principles approach when evaluating defamation claims in religious settings, requiring ecclesiastical abstention in *Jae-Woo Cha* but not in *Bowie*. The pastor in *Jae-Woo Cha* sued his church and various church officials after he was fired from his position as the educational pastor of the Korean Presbyterian Church. 262 Va. at 607. He claimed that two of the defendants had defamed him, one during a meeting of deacons and the other during a meeting of elders. *Id.* at 609-10. The pastor alleged that the defendants falsely accused him of borrowing money from the congregation and not repaying it. *Id.* Following those revelations, the elders fired him. *Id.* at 610. The pastor sued for breach of contract, defamation, and tortious interference with contract. But our Supreme Court held that none of those claims could be adjudicated without entangling the judiciary in a religious controversy. *Id.* at 612-15.

In particular, the defamation claims were barred because the two defendants' statements about the pastor's fitness to serve "cannot be considered in isolation, separate and apart from the church's decision to terminate his employment." *Id.* at 615. The defendants "were church officials who attended meetings of the church's governing bodies that had been convened for the purpose of discussing certain accusations against the [pastor]." *Id.*

By contrast, the Court did not require ecclesiastical abstention in *Bowie* because the case could be decided by "neutral principles of law, without reference to issues of faith and doctrine." 271 Va. at 135 (quoting *Reid*, 229 Va. at 188). Bowie was a church deacon whom the pastor and several church officials had accused of assault after Bowie grabbed the wrist of a congregant during a contentious church meeting. *Id.* at 129-31. Based on the alleged assault, church officials voted to dismiss Bowie as a deacon and demote his membership status in the church. *Id.* at 130. The defendant pastor wrote a letter to the congregation repeating the assault allegation. *Id.* at 131.

Although the dispute arose in a church setting, *Bowie* distinguished *Jae-Woo Cha* as a case "where the plaintiff's defamation claims were so connected to his wrongful termination claim as to mix with 'ecclesiastical decisions regarding the appointment and removal' of church officials." *Id.* at 135 (quoting *Jae-Woo Cha*, 262 Va. at 613). Bowie, by contrast, had pleaded his defamation claim narrowly to avoid ecclesiastical questions:

> While it is clear that some of the allegedly defamatory statements were made at a church meeting in which Bowie's status as deacon was the primary issue, Bowie [pleaded] his defamation claims in such a manner that the circuit court, unlike the trial court in [*Jae-Woo*] *Cha*, can consider them in isolation, separate and apart from the church governance issue involved in Bowie's status as a deacon.

*Id.* The alleged defamatory statements could be evaluated "for their veracity and the impact they had on Bowie's reputation the same as if the statements were made in any other, non-religious context[,] . . . separate and apart from the church governance issue involved in Bowie's status as a deacon." *Id.*

Five considerations show why *Jae-Woo Cha* controls the outcome here and why this case is distinguishable from *Bowie*.

- 15 -

First, while Bowie pleaded his defamation claim to steer clear of "the church governance issue," *id.*, Marshall's allegations accelerate into it. Common-law defamation requires a statement that is provably false. *Schaecher v. Bouffault*, 290 Va. 83, 102 (2015). Marshall's central complaint here is that Bishop Haynes told the congregation that Marshall engaged in "verbal behaviors and physical behaviors *that crossed the line of what is appropriate between a priest and a parishioner or staff person*." Compl. ¶ 93 (emphasis added). Determining the truth of whether Marshall's conduct "crossed the line of what is appropriate" for a priest will require interpreting Title IV of the canons of the Episcopal Church, entangling the court in a religious question.

Marshall aggravates that problem by pleading that Bishop Haynes lied when she told the congregation that the Church had followed the "whole process" prescribed by Title IV. Compl. ¶¶ 68-71. He also pleads that the Vestry used the bishop's defamatory statements to make an end-run around the Title IV process, urging the bishop to depose Marshall under Title III instead. Compl. ¶¶ 126-30. Whether such statements are true cannot be answered by civil courts. Civil courts are barred from examining whether a church has "followed its own procedures." *Hosanna-Tabor*, 565 U.S. at 187. They are likewise barred from evaluating "the conformity of the members of the church to the standard of morals required of them." *Serbian E. Orthodox*, 426 U.S. at 714 (emphasis altered) (quoting *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 714 (1871)).

Second, and relatedly, evaluating the truth of the bishop's statements about Marshall would turn on the ecclesiastical definition of sexual misconduct. The Episcopal Church's definition is exceedingly broad. "Sexual Misconduct" includes "Sexual Behavior engaged in by the Member of the Clergy with a person *for whom the Sexual Behavior is unwelcome or who does not consent*." *Constitution and Canons, Together with the Rules of Order, for the*

*Governance of the Protestant Episcopal Church in the United States of America* (2018),

https://perma.cc/92Q9-YKUZ (emphasis added) [hereafter "*Episcopal Church Canons*"].

"Sexual Behavior," in turn, includes "any physical conduct, bodily movement, *speech*,

*communication or other activity sexual in nature*." *Id.* (emphasis added). That definition

encompasses far broader conduct than what is prohibited by secular workplace-harassment rules

like those under Title VII of the Civil Rights Act of 1964.[9] As courts in other jurisdictions have

recognized, civil courts cannot adjudicate defamation claims when the truth of the statements in

question turns on ecclesiastical law. *See In re Diocese of Lubbock*, 624 S.W.3d 506, 515-16

(Tex. 2021) (requiring ecclesiastical abstention because the truth of the church's statement that

the priest abused a "minor" depended on canon law that defined "minor" to include "vulnerable

adults"); *Lippard v. Holleman*, 844 S.E.2d 591, 602 (N.C. Ct. App. 2020) (requiring

ecclesiastical abstention because whether the church pianist failed to "acknowledge[] . . .

personal responsibility for her failures" required evaluating those failures "in biblical context"

and interpreting "Ephesians 4").

Third, just as in *Jae-Woo Cha*, the dispute here arose in the context of a

church-disciplinary investigation that culminated in the minister's firing, a decision at the core of

a church's self-governance. In defense, Bishop Haynes would point to the Conference Panel's

finding, after an investigation and two-day hearing, that Marshall did, in fact, engage in sexual

misconduct in violation of canon law. Thus, Marshall's defamation claims "cannot be

---

[9] *See* 29 C.F.R. § 1604.11 (2023) ("Harassment on the basis of sex is a violation of section 703 of title VII [42 U.S.C. § 2000e-2]. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.").

considered in isolation, separate and apart from the church's decision to terminate his employment." *Jae-Woo Cha*, 262 Va. at 615.

Similarly, as Marshall acknowledged at oral argument, the bishop would also defend on the ground that she was engaged in pastoral counseling when she told the congregation about the sexual-misconduct complaint. As Bishop Haynes points out on brief, Canon 8 of Title IV calls upon the diocesan bishop to provide pastoral care for "all those who may be affected by an alleged Offense," including the "affected Community." *See Episcopal Church Canons*, *supra*, at 219. "In every case, and notwithstanding any other provision . . . to the contrary, the Bishop Diocesan may disclose such information concerning any alleged Offense . . . as the Bishop Diocesan deems pastorally appropriate." *Id.* Thus, the trier of fact would be drawn into examining whether Bishop Haynes's conduct was within the scope of what canon law considers "pastorally appropriate," something a secular court is forbidden from doing.

Fourth, Marshall's claim that the bishop's defamation caused his firing would raise intractable causation questions that would further ensnare the trial court in religious matters. Marshall seeks damages for the destruction of his "entire career," Compl. ¶ 137, which he confirmed at oral argument means his career "as a priest." But Marshall does not contest his defrocking. So determining the extent to which his defrocking destroyed his career as a priest, rather than the alleged defamation, would necessarily snare the trial court in matters involving the discipline and dismissal of a religious leader.

Finally, as Bishop Haynes points out on brief, all Episcopal priests, including Marshall, have pledged to follow rules that sometimes require them to forgo secular remedies. Canon 19 of Title IV, for instance, states that "Members of the Clergy have voluntarily sought and accepted positions in the Church and have thereby given their consent to subject themselves to the Discipline of the Church." *Episcopal Church Canons*, *supra*, at 254. The canon adds that

"[n]o member of the Church . . . may . . . resort to a secular court to address a dispute arising under the [Episcopal Church's] Constitution and Canons." *Id.* at 255. As the Supreme Court explained in *Serbian Eastern Orthodox*, "All [adherents] who unite themselves to such a [religious] body do so with an implied consent to [ecclesiastical] government, and [they] are bound to submit to it." 426 U.S. at 711 (quoting *Watson*, 80 U.S. (13 Wall.) at 729). "[I]t would be a *vain consent* and would lead to *the total subversion of such religious bodies*, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed." *Id.* (emphases added) (quoting *Watson*, 80 U.S. (13 Wall.) at 729).

In short, although Marshall denies that he wants a secular court to undo his defrocking, his defamation claim is so intertwined with the bishop's deposing him as a priest that the defamation claim cannot be litigated without entangling the court in a religious dispute. When a priest who has been fired sues the church and its leadership raising tort claims that cannot be unscrambled from the church's decision to fire him, "the First Amendment has struck the balance for us." *Hosanna-Tabor*, 565 U.S. at 196. Churches have an overarching interest "in choosing who will preach their beliefs, teach their faith, and carry out their mission." *Id.* In order for a church to remain "free to choose those who will guide it on its way," *id.*, such tort claims must sometimes give way.

CONCLUSION

The trial court erred in concluding that Marshall's claim for defamation per se against Bishop Haynes could be resolved on secular principles. The trial court should have sustained Bishop Haynes's plea in bar and dismissed Count XI with prejudice. We reverse the June 20, 2023 interlocutory order to the extent it overrules Bishop Haynes's plea in bar to Count XI, and we remand this case for further proceedings consistent with this opinion.

*Reversed and remanded.*