COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, Fulton and Friedman
Argued at Norfolk, Virginia


ANGEL L. JONES

MEMORANDUM OPINION* BY
v.        Record No. 0744-24-1        JUDGE FRANK K. FRIEDMAN
AUGUST 26, 2025

CITY OF PORTSMOUTH


FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Randall D. Smith, Judge Designate

Stephen E. Heretick (Louis N. Joynes, II; Stephen E. Heretick, P.C.;
Joynes & Gaidies, P.C., on briefs), for appellant.

K. Barrett Luxhoj; Deborah Y. Collins (Darius K. Davenport;
Crenshaw, Ware & Martin, P.L.C.; Yeng Collins Law, PLLC, on
briefs), for appellee.


Angel Jones, former city manager of the City of Portsmouth, challenges the circuit court's

dismissal of her lawsuit against the City for wrongful termination, intentional infliction of emotional

distress, and breach of contract. We hold that the doctrine of sovereign immunity bars Jones' claim

for wrongful termination and that Jones failed to state a claim for intentional infliction of emotional

distress. We also conclude that the breach of contract claim is waived. Accordingly, we affirm the

circuit court's judgment.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

A. The Alleged Atmosphere of Kickbacks, Bribes, Self-Dealing, and Corruption

In April of 2021, the Portsmouth City Council hired Jones, by a majority vote, as the new city manager of Portsmouth. Shortly after her appointment, Jones learned about alleged improper conduct by certain members of the City Council that occurred prior to her appointment.

For instance, according to her pleadings, Jones learned from LaVoris Pace, the deputy city manager, that Vice-Mayor De'Andre Barnes accepted a bribe from Eugene Swinson, a local resident, who was trying to help his sister obtain the city manager position. Jones was also informed by Pace, prior to Jones' appointment, that Barnes, Councilman Paul Battle, and soon-to-be Councilman Christopher Woodard accepted bribes from Danny Meeks, a former city councilmember, who sought to be appointed as the city manager. Barnes purportedly rescinded his support for Meeks after Swinson offered to pay off Barnes' child support obligations.

One month into the job, Jones "began hearing rumors" that she would be terminated in January 2022 once the vacant seat on the City Council was filled by Woodard. Jones also learned that Barnes demanded a "donation" from a casino to his youth basketball program.[2]

---

[1] The claims here were dismissed by the circuit court on the City's demurrer and plea in bar, where no evidence was taken; therefore, we accept as true the facts alleged in Jones' complaint for purposes of this appeal. *See Massenburg v. City of Petersburg*, 298 Va. 212, 216 (2019) ("[W]here no evidence is taken in support of a plea in bar, the trial court, and the appellate court upon review, consider solely the pleadings in resolving the issue presented" and "the facts stated in the plaintiff's [complaint] are deemed true." (second alteration in original) (quoting *Lostrangio v. Laingford*, 261 Va. 495, 497 (2001))); *Hubbard v. Dresser, Inc.*, 271 Va. 117, 119 (2006) (in reviewing a demurrer, "[w]e accept as true all facts properly pleaded in the bill of complaint and all reasonable and fair inferences that may be drawn from those facts" (quoting *Glazebrook v. Bd. of Supervisors of Spotsylvania Cnty.*, 266 Va. 550, 554 (2003))).

[2] Similarly, a prominent local family wanted to improve the City's basketball courts, and Barnes solicited a donation from the family in exchange for his assistance. The family then informed other members of the City Council that they did not want to work with Barnes any further.

In July, Pace informed Jones that he had an offer to work for the City of Norfolk. Jones explained that, because he was already at the top of the City's pay scale, the City could not match his offer. Battle pressured Jones to bring the issue of Pace's salary before the City Council. Jones denied this request and reminded Battle that, pursuant to the Portsmouth City Charter, he should not interfere with the city manager's personnel decisions.[3]

In August, according to Jones' pleadings, Councilman Mark Whitaker summoned Jones to a private meeting in the basement of his father's church, where he "castigated and chastised" Jones for "allowing" Pace to accept the Norfolk position. Jones explained that Pace was already at the top of the pay scale and consistent with city policy she could not justify an increase to his salary. Whitaker claimed "this type of thing" had been done previously and reminded Jones that he was one of the four councilmembers that supported her hiring.[4] After this meeting, Jones "began to experience increasing public and private displays of disrespect" from Whitaker, Battle, and Barnes, along with "largely unfounded criticisms" of her job performance.

In September, the City was in the process of distributing federal funds received from the American Rescue Plan Act of 2021 (ARPA). Barnes asked Jones "to extend ARPA-based grant funding at the level of $30,000.00 each for the Department of Parks & Recreation List of Nonprofit Partners listed on the City's website[.]" Jones was unaware when Barnes made the request that his

---

[3] Jones contends that §§ 3.10 and 3.11 are implicated here. *See* Portsmouth City Charter § 3.10 ("No member of the City Council shall be allowed to furnish any goods or services except services as a member of City Council for which he or she received any consideration in money or otherwise, either directly or indirectly, under penalty of the forfeiture of office."); Portsmouth City Charter § 3.11 ("Neither the City Council nor any of its members shall direct or request the appointment of any person to or the removal of any person from any office or employment by the City Manager or by any of the Manager's subordinates, or in any way take part in the appointment of or removal of officers and employees of the city except as specifically provided in this Charter.").

[4] Ultimately, Deputy City Manager Pace accepted the position with the City of Norfolk in August of 2021.

organization was one of the City's nonprofit partners that would benefit from receiving ARPA funds. During this month, Jones also promoted Renaldo Prince to the position of Portsmouth Police Chief. Then in October, Battle and Barnes informed Jones that they wanted her to hire someone else for that position. Battle told Jones to fire Prince and to instead hire Undersheriff Marvin Waters, a friend of Barnes and Battle. Jones denied this request.

Interim City Attorney Burle Stromberg met with Jones in November of 2021 "to discuss a pending legal action against the city," and he told Jones that "he suspected that one or more members of City Council had contacted Ms. Credle [the claimant] to suggest that she demand a larger settlement . . . than she had previously agreed to accept." According to Jones' pleadings, Stromberg

> bec[a]me suspicious because both the City and Ms. Credle had previously negotiated and agreed upon a settlement of her claim, but shortly after the settlement terms were privately disclosed to the members of City Council Ms. Credle suddenly disregarded her previous settlement and demanded an increase in the settlement amount which was significantly more than she had even sought in her initial claim[.]

Around this time, Jones also learned that certain councilmembers were trying to circumvent Jones' authority by "direct[ing] various administrative services of the City directly rather than through her as the City Manager."

In November, Barnes, Battle, Whitaker, and Woodard sought to appoint Herman Smith—Barnes' personal attorney—as the City Attorney of Portsmouth. At a City Council meeting in December, the City Council considered appointing Smith as City Attorney. The vote was ultimately delayed, however, so that the City Council could further examine Smith's professional history and qualifications, since there were claims that he had a criminal history and professional disciplinary issues.

The same month, a local developer, Alvin Keels, submitted multiple development plans, including a 300-million-dollar project on the waterfront and another on Greenwood Drive, both in the City. While reviewing the proposals, Jones learned that Barnes solicited a donation from Keels in exchange for Barnes' support for these developments, which needed approval from the City Council. Jones also

> learned that in order for an ongoing lawsuit filed against the City by Councilman Whitaker to have any potential validity, the development plan on the Greenwood Driver property which Alvin Keels sought to be developed would have to be evaluated and reviewed by various city departments and ultimately approved by the City Council[.]

After Smith's appointment was delayed, Battle met with Jones and informed her that if Smith was appointed as city attorney he would resolve Whitaker's pending lawsuit against the City: "Smith had agreed to settle the lawsuit Councilman Whitaker had pending against the City of Portsmouth . . . seeking $5,350,000.00 in damages, and that some of the proceeds of that settlement would then be shared between Vice-Mayor Barnes and Councilman Woodard in the form of kickbacks for their support[.]" Battle also told Jones during this meeting that "Whitaker and the boys are hungry for money, and the ARPA funds[] are driving them crazy[.]" He also informed Jones that his colleagues—Barnes, Whitaker, and Woodard—"were extremely upset with him because he delayed their efforts to hire Herman Smith as Portsmouth's City Attorney[.]" Battle again told Jones that he wanted the police chief replaced.

Jones learned in January of 2022 from Deputy City Manager Robert Baldwin that former councilmember Meeks provided a loan to Keels to obtain the City Council's approval for a use permit to develop the Greenwood Drive property. Meeks and Keels intended to sell the property for two million dollars once the permit was obtained. Once the permit was obtained, however, "Keels kept the property for himself, leaving . . . Meeks out of the deal[.]"

By this point, Jones came to believe that there was widespread, systematic corruption by Barnes, Battle, Whitaker, and Woodard in the form of bribes, kickbacks, and a "pay to play" environment. Jones was concerned that if she "acquiesce[d] and cooperate[d] with them in the perpetration of these schemes [she] could expose her[self] to criminal liability[.]"[5]

In February, Whitaker informed Jones that his support for her was "waning." He criticized her for attending a public safety press conference and informed her that she needed to "realize who's in charge." Two days later, Whitaker sent Jones an email to notify her that a special meeting was scheduled the following month to discuss her job performance. She was informed by the Sheriff of Portsmouth that Whitaker had approached him to see if he would be interested in the position of police chief.

In March, Battle disclosed to Jones that his colleagues—Whitaker, Barnes, and Woodard— were still upset with him because he would not vote to terminate the interim city attorney. According to Jones' pleadings, allegations also emerged, around this time, that Barnes and Woodard required the public to pay them for information or assistance on public matters that were within their duties as members of the City Council.

In May of 2022, Barnes approached Pace, who was working for the City of Norfolk, and asked if he would be interested in the city manager position in Portsmouth. Pace stated that he was not interested. Later that month, Jones received a call from Whitaker, who requested to meet with her. During their meeting, Whitaker informed Jones that he had sufficient votes to terminate her employment, and he offered her an opportunity to submit her resignation in lieu of termination. Jones declined the offer.

---

[5] Again, no evidence was taken, and we accept these claims from Jones' pleadings as true for purposes of review. *See Massenberg*, 298 Va. at 216; *Hubbard*, 271 Va. at 119.

B. Councilmembers Fire Jones at a Public Meeting

On May 24, 2022, at the City Council meeting, Whitaker moved to amend the meeting agenda without notice and to take up a motion to terminate Jones as the city manager. The motion was approved by a vote of four to three.[6] No cause was provided for her termination.[7]

Jones' complaint asserted four causes of action: (1) wrongful termination, (2) breach of contract, (3) fraud in the inducement, and (4) intentional infliction of emotional distress.[8] Jones sought damages in the amount of five million dollars on each claim. She sued the City of Portsmouth—and did not bring claims against any of the councilmembers in their individual capacities.

Jones alleged that the way in which she was terminated—"in a fully public meeting and on live television and at a time when . . . Jones could not respond to such allegations"—constituted willful, wanton, and deliberate conduct that was intended to humiliate and embarrass her. Jones asserted that Barnes, Battle, Woodard, and Whitaker "effectively hijacked the legitimate governmental functions of" the City Council and turned it "into a criminal enterprise, and in so doing placed their personal interests over that of the citizens of the City of Portsmouth[.]" Jones provided that "had she acquiesced in, cooperated with, or colluded with the unlawful demands of

---

[6] Vice-Mayor Barnes and Councilmen Battle, Whitaker, and Woodard supported the motion, while Mayor Shannon Glover, Councilwoman Lisa Lucas-Burke, and Councilman William Moody opposed the motion.

[7] Jones' employment agreement stated that she could be terminated without cause:

> Termination by the City Without Cause. The Council shall have the right to terminate this Agreement at any time by providing the Employee with written notice setting forth the effective date of termination and paying severance pay[.]

[8] Jones does not challenge the circuit court's dismissal of her fraud in the inducement claim; therefore, that issue is not before us.

the four members of the City Council . . . Jones[] could have thereby subjected herself to violations of the criminal laws of the Commonwealth of Virginia and the United States[.]"[9]

C.  The Circuit Court Rejects Jones' Claims

The City filed a plea in bar and a demurrer, seeking to dismiss Jones' suit.  The City, in its plea in bar, argued that the doctrine of sovereign immunity applied and barred Jones' claims for wrongful termination and intentional infliction of emotional distress.  It further argued, in its plea in bar, that the doctrine of impossibility barred Jones' breach of contract claim.  The City's demurrer argued that Jones' complaint failed to state any claims.

---

[9] Jones, in the complaint, lists the following criminal statutes that she "could . . . have subjected herself to" if she cooperated with "the unlawful demands of the four members of the City Council":

> Conspiracy to Commit Larceny, Section 18.2-23 of the Code of Virginia (1950), as amended; Embezzlement of Public Funds, Section 18.2-112 of the Code of Virginia (1950), as amended; Misuse of Public Assets, Section 18.2-112.1 of the Code of Virginia (1950), as amended; Forgery of Public Documents, Section 18.2-168 of the Code of Virginia (1950), as amended; Conspiracy to Facilitate Bribery of a Public Official, Sections 18.2-26 and 18.2-446 *et seq.*, of the Code of Virginia (1950), as amended; the Virginia Business Conspiracy Act, Section 18.2-499 of the Code of Virginia (1950), as amended; Conspiracy to Obtain Money by False Pretenses, Sections 18.2-26 and 18.2-178 of the Code of Virginia (1950), as amended; the Virginia Governmental Frauds Act, 18.2-498.3 of the Code of Virginia (1950), as amended; the Virginia Racketeer Influenced and Corrupt Organizations Act, 18.2-514 *et seq.*, of the Code of Virginia (1950), as amended; Conspiracy to Commit Fraud Upon the United States, Title 18, United States Code, Sections 371, 1031; Embezzlement of Public Money, Property or Records, Title 18, United States Code, Section 641; and Theft or Bribery Concerning Programs Receiving Federal Funds, Title 18, United States Code, Section 666; the Racketeer Influenced and Corrupt Organizations Act (RICO), Title 18, United States Code, Sections 1961 *et seq.*, and the Federal False Statements Act, Title 18, United States Code, Section 1001.

On October 17, 2023, the circuit court, among other things, granted the City's plea in bar, in part, finding that sovereign immunity applied and barred Jones' claims for wrongful termination and intentional infliction of emotional distress. The circuit court denied the City's plea in bar on Jones' breach of contract claim, and it also overruled the City's demurrer as to both the wrongful termination and breach of contract claims. The circuit court, however, sustained the City's demurrer on the intentional infliction of emotional distress claim. Jones was ordered to file a bill of particulars related to the breach of contract claim and to identify "what damages were reasonably foreseeable."

Upon Jones filing her bill of particulars, the City renewed its plea in bar and demurrer on the breach of contract claim. Jones' response confirmed that she had received a package that included six months of severance pay. In its final order, the circuit court sustained the City's demurrer to Jones' breach of contract claim and found that the plea in bar was moot. It ruled specifically that Jones' contract claim failed because she could not establish damages since she received the maximum recovery permitted under the contract.

Jones now appeals, arguing that sovereign immunity does not apply here and that her complaint alleges sufficient facts to state claims for wrongful termination, breach of contract, and intentional infliction of emotional distress. The City raises two assignments of cross-error, arguing that the circuit court erred when it found that Jones stated a claim for wrongful termination.

ANALYSIS

A. *The Wrongful Termination Claim*

The City contends that Jones' pleading fails to state a claim for wrongful termination. The City further argues that even if a claim was stated, it would fall prey to the City's sovereign immunity defense. Even though Jones' position was terminable at will, and she could be fired without cause, Jones contends that the manner in which she was terminated violated public policy

- 9 -

under *Bowman v. State Bank of Keysville*, 229 Va. 534 (1985).  In particular, her pleadings assert that systematic corruption by various councilmembers placed her in a position of violating laws and exposing herself to criminal liability by acquiescing to their dishonorable conduct, or losing her job by refusing to cooperate with their schemes which harmed the City and their constituents.

The circuit court found that Jones' wrongful termination claim survived the City's demurrer. We, however, do not need to reach that question, given our view on the City's sovereign immunity defense.

   1. *We assume without deciding that Jones stated a wrongful termination claim.*

"In this case, as in all others, we seek to decide cases, 'on the best and narrowest ground available' from the record."  *Foltz v. Commonwealth*, 58 Va. App. 107, 114 (2011) (quoting *Kirby v. Commonwealth*, 50 Va. App. 691, 698 n.2 (2007)).  "This approach encourages 'judicial self-restraint' by avoiding the resolution of broad, reasonably debatable legal issues when narrower, less debatable legal issues fully dispose of the appeal before the court."  *Id.* (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 566 (2009)).  "The 'best' answer to a legal question is the one with which the least number of jurists would disagree or, in other words, the one with which the greatest number of jurists would agree.  The 'narrowest' answer to a legal question is the one affecting the least number of cases."  *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020).

By assuming without deciding that Jones stated a claim for wrongful termination, we need not reach the City's assignments of cross-error that the circuit court erred by overruling the City's demurrer on Jones' wrongful termination claim.  *See Commonwealth v. Swann*, 290 Va. 194, 196 (2015) ("The doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010))).

*2. The circuit court did not err in granting the City's plea in bar on Jones' wrongful termination claim.*

"The existence of sovereign immunity is a question of law that is reviewed de novo." *City of Chesapeake v. Cunningham*, 268 Va. 624, 633 (2004).

"The doctrine of sovereign immunity is 'alive and well' in Virginia." *Niese v. City of Alexandria*, 264 Va. 230, 238 (2002) (quoting *Messina v. Burden*, 228 Va. 301, 307 (1984)). "Sovereign immunity is a rule of social policy, which protects the state from burdensome interference with the performance of its governmental functions and preserves its control over state funds, property, and instrumentalities." *Newport News School Bd. v. Z.M.*, ___ Va. ___, ___ (May 8, 2025) (quoting *City of Virginia Beach v. Carmichael Dev. Co.*, 259 Va. 493, 499 (2000)). "Most importantly, the doctrine of sovereign immunity provides for 'smooth operation of government' and prevents citizens from 'improperly influencing the conduct of governmental affairs through the threat or use of vexatious litigation.'" *Id.* at ___ (quoting *Carmichael*, 259 Va. at 499).

"Virginia has long recognized that local governments share in the Commonwealth's sovereign immunity." *Massenburg v. City of Petersburg*, 298 Va. 212, 217 (2019). "Unlike counties, which share fully in the sovereign's immunity from tort, whether a municipal corporation is entitled to sovereign immunity protections depends on the type of function it exercises when liability arises." *Id.* at 217-18 (internal citations omitted). "Sovereign immunity protects municipalities from tort liability arising from governmental functions but not proprietary functions." *Patterson v. City of Danville*, 301 Va. 181, 189 (2022). "[W]hen governmental and proprietary functions coincide, 'the governmental function is the overriding factor' and the doctrine of sovereign immunity will shield the locality from liability." *Carmichael*, 259 Va. at 499 (quoting *Taylor v. Newport News*, 214 Va. 9, 10 (1973)).

"A municipality engages in a governmental function when it exercises powers and duties exclusively for the public welfare, effectively acting 'as an agency of the state to enable it to better

- 11 -

govern that portion of its people residing within its corporate limits.'" *Patterson*, 301 Va. at 189 (quoting *Hoggard v. City of Richmond*, 172 Va. 145, 147 (1939)). "A function is governmental if it is 'directly tied to the health, safety, and welfare of the citizens.'" *Niese*, 264 Va. at 239. The Supreme Court has also observed that "a governmental function involves 'the exercise of an entity's political, discretionary, or legislative authority.'" *Id.* (quoting *Carter v. Chesterfield Cnty. Health Comm'n*, 259 Va. 588, 591 (2000)); *see also Page v. Portsmouth Redevelopment & Hous. Auth.*, ___ Va. ___, ___ (July 3, 2024) (noting that "[g]overnmental functions have a 'political, discretionary and legislative' character, and typically involve exercises of 'discretion' while performing 'delegated or imposed' duties" (internal citation omitted)).

On the other hand, a municipality performs a proprietary function when it exercises "its powers and privileges primarily for its own benefit." *Massenburg*, 298 Va. at 218. "[P]roprietary functions generally involve nondiscretionary duties such as those imposed by the common law on private parties." *Page*, ___ Va. at ___.

   a. Sovereign Immunity Applies to Claims Against a Municipality for Gross Negligence and Intentional Torts Where the Underlying Act is a Governmental Function

As an initial matter, Jones contends that claims against a municipality for gross negligence and intentional torts automatically overcome sovereign immunity. We disagree.

In certain circumstances, a municipality is immune from suit for intentional torts of its employees. Our Supreme Court has held "that a municipality is immune from liability for intentional torts committed by an employee during the performance of a governmental function." *Niese*, 264 Va. at 239. Quite recently, in *Newport News School Board v. Z.M.*, the Supreme Court reiterated this principle and explained that although the School Board itself was immune from suit,

the individual actors in their personal capacities "are not protected by derivative sovereign immunity." ___ Va. at ___.[10]

Notably, because the "government can function only through its servants," some "of those servants must enjoy the same immunity in the performance of their discretionary duties as the government enjoys." *Patterson*, 301 Va. at 190 (quoting *First Va. Bank-Colonial v. Baker*, 225 Va. 72, 79 (1983)). Although courts often refer to this "derivative immunity" as providing "the same immunity" enjoyed by the government, derivative immunity has additional limitations. For instance, government employees who commit intentional torts are not protected by derivative sovereign immunity. *See, e.g.*, *Fox v. Deese*, 234 Va. 412, 424 (1987); *Elder v. Holland*, 208 Va. 15, 19 (1967). But the municipality itself remains "immune from liability for intentional torts committed by an employee during the performance of a governmental function." *Niese*, 264 Va. at 239.[11] This protects the public purse from liability for an employee's self-dealing, intentional acts—but nonetheless offers the victim a remedy against the rogue actor.

Here, Jones sued the City of Portsmouth only and did not sue any of the individual city councilmembers. Thus, to determine whether the municipality can be subject to the wrongful termination claim, the main issue before us is whether the City's conduct constitutes a governmental or proprietary function.

---

[10] Again, here, Jones sued the City and did not sue the individual councilmembers so we do not reach the question of whether derivative sovereign immunity would apply to a wrongful termination claim against the four individual councilmembers that Jones claims acted wrongfully.

[11] Similarly, "[a]llegations of gross negligence can pierce through a *derivative* sovereign-immunity defense asserted by an otherwise immune government *employee*." *Patterson*, 301 Va. at 197 (emphases added); *see also Marlowe v. Sw. Va. Reg'l Jail Auth.*, 81 Va. App. 415, 423 (2024).

b. The City is Shielded by Sovereign Immunity as to the Wrongful Termination
Claim Because it was Conducting a Governmental Function

Based on our precedent, we conclude that the City is entitled to sovereign immunity for Jones' wrongful termination claim against the City. Sovereign immunity protects a municipality from suit when it engages in a governmental function. The selection and retention of a City's chief administrative officer is a decision that balances and evaluates the officer's management success, administration of funds, hirings and retentions as well as her overall performance. Here, the City's decision to terminate the city manager was within its authority, and it seems evident that such a decision was political, legislative, and discretionary in nature and character. *See Niese*, 264 Va. at 239 ("a governmental function involves 'the exercise of an entity's political, discretionary, and legislative authority'" (quoting *Carter*, 259 Va. at 591)); *see also Page*, ___ Va. at ___ (same).[12] While Jones plainly challenges the councilmembers' motivation for her firing, this does not change the fact that a City Council's vote regarding its satisfaction with the city manager's performance presents a discretionary and governmental function.

We conclude that the City was engaged in a governmental function when it terminated Jones as the city manager; therefore, sovereign immunity applies and bars this claim. Accordingly, we affirm the circuit court's judgment dismissing Jones' wrongful termination claim.

---

[12] In reaching this conclusion, we also find a recent, unpublished decision from this Court instructive. Angela Greene, former Portsmouth Chief of Police, brought a wrongful termination claim against the City of Portsmouth and two of its city managers, claiming that she was terminated in retaliation for her refusal to obey "unlawful directives" not to investigate certain activity. *Greene v. City of Portsmouth*, No. 1461-22-1, slip op. at 11 (Va. Ct. App. Mar. 19, 2024). This Court first addressed the City's immunity and defined the City's decision to terminate Greene's employment as falling within its function of maintaining and managing a police force, a classic governmental function that "necessarily entails employment decisions." *Id.* at 29. Accordingly, the City was immune from Green's wrongful termination claim. *Id.* "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012) (citing Rule 5A:1(f)).

*B. The circuit court did not err in sustaining the City's demurrer on Jones' intentional infliction of emotional distress claim.[13]*

Jones argues that the City "by and through the action of the four council members" is liable for intentional infliction of emotional distress due to the nature and circumstances of her termination. In addition, Jones contends that "these were not isolated incidents" and instead "these were sustained efforts specifically intended to subjugate Angel Jones into collusion with criminal conduct and acts of public malfeasance, and then to punish her by taking away her livelihood and poisoning her professional reputation when she refused."

"Because of problems inherent in proving a tort alleging injury to the mind or emotions in the absence of accompanying physical injury, the tort of intentional infliction of emotional distress is 'not favored' in the law." *Almy v. Grisham*, 273 Va. 68, 77 (2007) (quoting *Harris v. Kreutzer*, 271 Va. 188, 204 (2006)). "Thus, in contrast to a claim of negligence, a plaintiff alleging a claim for intentional infliction of emotional distress must allege in her motion for judgment all facts necessary to establish the cause of action in order to withstand challenge on demurrer." *Id.* And the plaintiff "must prove h[er] case by clear and convincing evidence." *SuperValu, Inc. v. Johnson*, 276 Va. 356, 370 (2008).

A party asserting a claim for intentional infliction of emotional distress must establish four elements.

> One, the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting

---

[13] Based on our affirmance of the circuit court's demurrer ruling—that Jones did not state a claim for intentional infliction of emotional distress—we need not reach the issue of whether sovereign immunity bars it. *See Esposito v. Va. State Police*, 74 Va. App. 130, 134 (2022) ("Appellate courts have an obligation to decide cases on the best and narrowest grounds available.").

- 15 -

> frivolous suits and avoiding litigation in situations where only bad
> manners and mere hurt feelings are involved. Three, there was a
> causal connection between the wrongdoer's conduct and the
> emotional distress. Four, the emotional distress was severe.

*Womack v. Eldridge*, 215 Va. 338, 342 (1974).

In discussing the second element related to the outrageous nature of the conduct, our Supreme Court has noted that "[i]t is insufficient for a defendant to have acted with an intent which is tortious or even criminal." *Harris*, 271 Va. at 204. "Even if a defendant 'has intended to inflict emotional distress,' or his conduct can be 'characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort,' the requirement of the second prong has not been satisfied." *Russo v. White*, 241 Va. 23, 27 (1991). Instead, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Harris*, 271 Va. at 204. "Insensitive and demeaning conduct does not equate to outrageous behavior as set by our caselaw." *Id.* "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery . . . ." *Doe v. Baker*, 299 Va. 628, 655 (2021) (alteration in original) (quoting *Womack*, 215 Va. at 342). The circuit court found that Jones' allegations failed to state a claim for intentional infliction of emotional distress. We agree.

We find *Viers v. Baker*, 298 Va. 553 (2020), which also involves the Supreme Court's review of an intentional infliction of emotional distress claim at the demurrer stage, highly instructive here. In *Viers*, the Supreme Court affirmed the circuit court's dismissal of plaintiff's intentional infliction of emotional distress claim. *Id.* at 564. Plaintiff was fired from her job in the Commonwealth's Attorney's office in Dickenson County after 29 years of service, and then the new Commonwealth's Attorney, who had fired her, told a local democratic committee that plaintiff was fired for tampering with his computer, a crime, which he knew was false. Our Supreme Court noted

that "[t]o survive demurrer, the behavior alleged must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Almy*, 273 Va. at 78). The Supreme Court concluded that, as a matter of law, the Commonwealth's Attorney's "conduct . . . was not outrageous or intolerable[,]" and further that "[t]he alleged conduct here . . . that [the Commonwealth's Attorney] intentionally inflicted emotional distress not by firing Viers but by allegedly lying to the DCDC and the county administrator when justifying his decision to do so—does not meet this standard." *Id.*

Similarly, Jones' allegations of distress do not rise to the level required to state a claim under Virginia law. The acts surrounding the termination are not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Harris*, 271 Va. at 204.[14] While Jones contends that the councilmembers put her in difficult and compromising situations, it is her public firing that is the primary source of her substantial public humiliation, embarrassment, and her alleged loss of reputation personally and professionally. At bottom, she suggests that during the course of her tenure she suffered public humiliation, ridicule, and distress which ultimately required her to seek medical treatment involving anxiety and depression. While we recognize that Jones, according to her allegations, was forced to navigate a rocky and uncomfortable situation, again, Virginia law sets a relatively high bar for stating a claim for intentional infliction of emotional distress. "[L]iability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Russo*,

---

[14] The City notes that a vote of City Council would naturally be a public one. It asserts: "All city, town, and county managers are hired or terminated at a public meeting."

241 Va. at 27. "[E]ven on demurrer, the court is not bound by . . . conclusory allegations when the issue involves, as here, a mixed question of law and fact." *Id.* at 28.

In *Harris*, the Supreme Court found that plaintiff "failed to plead facts sufficient to support the severity element." 271 Va. at 204. The plaintiff "alleged she suffered severe psychological trauma and mental anguish affecting her mental and physical well-being," and "[s]ymptoms of her anguish include[d] nightmares, difficulty sleeping, extreme loss of self-esteem and depression, requiring additional psychological treatment and counseling." *Id.* at 204-05. Further, plaintiff claimed "to have suffered mortification, humiliation, shame, disgrace, and injury to reputation." *Id.* at 205. The Supreme Court concluded that plaintiff "fail[ed] to allege injuries that 'no reasonable person could be expected to endure,'" and as a result, "she fail[ed] to allege facts sufficient to satisfy the fourth element of the *Womack* test." *Id.* The same is true here.[15]

We find *Harris* and *Viers* to be controlling in determining that Jones failed to state a claim for intentional infliction of emotional distress. Accordingly, we affirm the circuit court's ruling sustaining the City's demurrer as to Jones' emotional distress claim.[16]

---

[15] The Supreme Court in *Almy* distinguished *Harris* and found that plaintiff satisfied this element by describing various impairments arising from her distress. "While both Almy and the plaintiff in *Harris* alleged that they required counseling and suffered from severe psychological trauma, depression, humiliation, and injury to reputation, Almy additionally alleged that the defendants' actions rendered her functionally incapable of carrying out any of her work or family responsibilities." *Almy*, 273 Va. at 80. "According to Almy, her emotional distress reached such a level of severity that '[e]very aspect of [her] life [was] fundamentally and severely altered,' such that she 'had trouble even walking out of the front door.'" *Id.* (alterations in original). Almy's pleading survived demurrer while Harris' did not. Here, Jones' allegations more closely mirror Harris' than Almy's.

[16] Jones' third assignment of error contends that "the trial court erred in disregarding the appellant's claims of gross negligence committed by the City." Jones, however, did not assert in her complaint a claim for gross negligence. Jones also did not assert a claim for negligent infliction of emotional distress. *See, e.g.*, *Baker*, 299 Va. at 653 ("A plaintiff can recover damages for emotional distress when the defendant's negligence causes both emotional disturbance and physical injury.").

*C. Jones' breach of contract challenge is waived.*

"The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ramos v. Wells Fargo Bank, NA*, 289 Va. 321, 323 (2015) (quoting *Filak v. George*, 267 Va. 612, 619 (2004)). Jones argues on appeal that the circuit court erred by dismissing her breach of contract claim. Her assignment of error provides:

> The [t]rial [c]ourt [e]rred in [d]ismissing the [p]laintiff's [b]reach of [c]ontract [c]laim [b]ased [u]pon the City's [c]laim that the [c]ontract was [b]arred by the [d]octrine of [i]mpossibility and [u]pon [i]ts [d]etermination that the [w]ritten [n]otice [p]rovision [c]ontained in [a]ppellant Angel Jones' [e]mployment [a]greement was [s]atisfied by [o]ral [n]otice.

We start from the proposition that Jones' employment agreement stated that she could be terminated without cause: "The Council shall have the right to terminate this Agreement at any time by providing the Employee with written notice setting forth the date of termination and paying severance pay . . . ." In the circuit court, the City filed both a plea in bar and a demurrer, arguing that the breach of contract claim must be dismissed. The City's plea in bar argued that Jones' "claim for breach of contract (Count II) is barred under the doctrine of impossibility." Specifically, the City argued that because any termination of Jones would have to occur in a public meeting by a majority vote, it was impossible for the City to provide advanced written notice. The City's demurrer, by contrast, argued that Jones' breach of contract claim "fails to allege sufficient facts setting forth the damages incurred as a result of the City's alleged breach of the Employment Agreement." In its final order, the circuit court *sustained* the City's *demurrer* on the breach of contract claim and found that the plea in bar was rendered moot. In short, it did not reach the impossibility defense; instead, the circuit court specifically accepted the City's "lack of damages" argument. The circuit court observed that under the contract:

- 19 -

[I]f she was terminated for any reason whatsoever, then she would be entitled to liquidated damages that are contracted for, and that is the severance package, which the facts -- which it's stipulated that the plaintiff received.

So the best damages that plaintiff could prevail on she -- she has received.

This ruling on the issue of damages—that Jones did not appeal—presents multiple hurdles to Jones' assignment of error challenging the circuit court's dismissal of the breach of contract claim. First, Jones' assignment of error is deficient because it challenges a ruling (impossibility) never reached by the circuit court, and it also fails to encompass the actual basis (lack of damages) relied upon by the circuit court for sustaining the City's demurrer on this claim. *See Martin v. Lahti*, 295 Va. 77, 88 (2018) ("An assignment of error that does not address the findings or rulings in the trial court . . . is not sufficient." (alteration in original) (quoting Rule 5:17(c)(1)(iii)); *see also Moison v. Commonwealth*, 302 Va. 417, 420 (2023) ("[t]he purpose of assignments of error is to point out the errors with reasonable certainty in order to direct [the] court and opposing counsel to the points on which appellant intends to ask a reversal of the judgment, and to limit discussion to these points" (alterations in original) (quoting *Yeatts v. Murray*, 249 Va. 285, 290 (1995))).

Here, the record is clear that the circuit court found that the City's plea in bar—that raised the doctrine of impossibility and also involved the issue of notice—was moot because the court granted the City's demurrer related to the issue of damages.[17] Thus, Jones' assignment of error fails to encompass the actual basis for the circuit court's dismissal of the breach of contract claim: that Jones failed to allege sufficient facts that she suffered damage or injury from the City's breach. *See*

---

[17] The circuit court, during the demurrer hearing, questioned what damages Jones was entitled to receive, given that there was a factual stipulation that she received her full severance package as required by the contract. Further, the circuit court, in its October 17 order, required Jones to file a bill of particulars "regarding Plaintiff's breach of contract (Count II) to identify what other terms of the contract are alleged to have been breached by the City and what damages were reasonably foreseeable."

*Martin*, 295 Va. at 89 ("Failure to assign error to the trial court's ruling means that the issue is waived."); *see also* Rule 5A:20(c)(2). For this reason, we find that the assignment of error related to the breach of contract claim is deficient, and thus this issue is waived. *See Geouge v. Traylor*, 68 Va. App. 343, 373 (2017) ("Because [appellant] has assigned error to a ruling that the circuit court did not make, the circuit court could not and did not err in the manner alleged by [appellant] in the assignment of error. Thus, we cannot take cognizance of the claimed error.").

Moreover, Jones' opening brief is replete with argument and authority related to the issue of impossibility, which the circuit court never ruled upon. *See* Opening Br. at 27-33. Again, the City's demurrer, which the circuit court sustained, argued that "[t]he Complaint, as amplified by the Bill of Particulars, fails to allege sufficient facts setting forth the damages incurred as a result of the City's alleged breach of the Employment Agreement." But Jones, in her opening brief, provides no argument and no legal authority related to the issue of damages, which was the circuit court's basis for sustaining the City's demurrer. *See Amazon Logistics, Inc. v. Va. Emp. Comm'n*, ___ Va. ___, ___ (March 6, 2025) ("If an appellant fails to develop adequate argument in support of an assignment of error, the appellant waives that argument."). More to the point, where the appellant has failed to appeal an independent ground supporting the circuit court's ruling on an issue, this shortcoming bars any relief that might have been available on that issue. *See Manchester Oaks Homeowners Ass'n. v. Batt*, 284 Va. 409, 421 (2012) ("It is well-settled that a party who challenges the ruling of a lower court must on appeal assign error to each articulated basis for that ruling."); *see also Johnson v. Commonwealth*, 45 Va. App. 113, 116 (2005) ("If we were to hold otherwise, 'an appellant could avoid the adverse effect of a separate and independent basis for the judgment by ignoring it and leaving it unchallenged.'" (quoting *San Antonio Press v. Custom Bilt Machinery*,

852 S.W.2d 64, 65 (Tex. App. 1993))).  Here, Jones' contract claim is not preserved because she has

not appealed the circuit court's lack of damages ruling.[18]

CONCLUSION

We conclude that sovereign immunity applies here and bars Jones' claim against the City

for wrongful termination.  We also determine that Jones failed to state a claim for intentional

infliction of emotional distress and that her breach of contract claim is waived.  Thus, we affirm the

circuit court's judgment.

*Affirmed.*

---

[18] The City has requested appellate attorney fees.  The City has articulated no basis upon which it is entitled to recover them.  In any event, the parties raised substantial issues in this appeal and both sides presented the case ably, thoroughly, and creditably.  We decline to award the City attorney fees.